UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | ) | |
| KEVIN EFAW, | ) | |
| | ) | Civil Action |
| Plaintiff, | ) | 07-598 |
| | ) | |
| v. | ) | |
| | ) | |
| FALLS TOWNSHIP, et al., | ) | Philadelphia, PA |
| | ) | March 30, 2009 |
| Defendants. | ) | 12:40 |

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE M. FAITH ANGELL
UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:          JEFFREY R. LESSIN, ESQUIRE
                            MARK T. RICHTER, ESQUIRE
                            Jeffrey R. Lessin & Associates, PC
                            Two Penn Center
                            Suite 600
                            1500 John F. Kennedy Boulevard
                            Philadelphia, Pennsylvania 19102

For the Defendant:          DAVID P. KARAMESSINIS, ESQUIRE
                            CHRISTINE MUNION, ESQUIRE
                            Law Offices William J. Ferren &
                            Associates
                            10 Sentry Parkway
                            Suite 301
                            Blue Bell, Pennsylvania 19422

Audio Operator:             Inna Goldshteyn

Transcribed by:             DIANA DOMAN TRANSCRIBING
                            P.O. Box 129
                            Gibbsboro, New Jersey  08026-129
                            PHONE:  (856)435-7172
                            FAX:    (856) 435-7124
                            Email:  Dianadoman@Comcast.net

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

<u>I N D E X</u>

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS | <u>THE COURT</u> |
|-----------|--------|-------|----------|---------|-----------|
| Kevin Efaw | 33 | 56 | 79 | | |
| Jeffrey Rhodunda | 81 | | | | |

<u>Jury Instructions</u>        4

1    (Call to the Order of the Court)

2       THE COURT:  Thank you, jurors.  Would you please be

3    seated.  All right.  Members of the jury, we are about to begin

4    the trial of the case upon which you've heard some details

5    during the process of jury selection.

6       Before the trial begins, however, there are certain

7    instructions you should have, in order to better understand

8    what will be presented to you and how you should conduct

9    yourselves during the trial.

10      This is, as I said earlier, a civil trial.  The party

11   who brings the lawsuit is the plaintiff.  In this action, the

12   plaintiff is Kevin Efaw, whom you saw this morning.

13      Mr. Efaw is represented by Mr. Lessin and Mr.

14   Richter.  The party against whom the suit is brought is called

15   the defendant.  In this action the defendants are, Falls

16   Township and Police Officers Henry Ward, Jeffrey Rhodunda,

17   Edward Elmore and Steve Langan, in their individual capacities.

18      Defendants are represented by Mr. Karamessinis and

19   Ms. Munion.  It will be your duty to find from the evidence

20   what the facts are.  You, and you alone, are the judges of the

21   facts.  You will have to apply to those facts the law as the

22   Court, namely, me, will give it to you.  You must follow the

23   law, whether you agree with it or not.

24      Nothing that the Court may say or do during the

25   course of the trial is intended to indicate, nor should be

1   taken by you as indicating what your verdict should be.  The

2   evidence from which you will find the facts will consist of the

3   testimony of witnesses, documents and other things received

4   into the record as exhibits.  And any facts the attorneys have

5   agreed to, or that I may instruct you to find.

6        Certain things are not evidence, and must not be

7   considered by you.  I will list them.  Statements, arguments

8   and questions by lawyers are not evidence.  Objections to

9   questions are not evidence.  Lawyers may sometimes make

10  objections to some of the testimony or other evidence.

11       It is the duty of a lawyer to object to evidence

12  which he or she believes is improper under the Rules of

13  Evidence.  You should not be influenced by the objection, or by

14  the Court's ruling on it.

15       If the objection is sustained, ignore the question.

16  If the objection is overruled, treat the answer as though it

17  were like any other.  If you are instructed that some item of

18  evidence is received for a limited purpose only, you must

19  follow that instruction.

20       Testimony that the Court excludes, or instructs you

21  to disregard, is not evidence and must not be considered.

22       Anything you may have seen or heard outside the

23  courtroom is not evidence, and thus you must be disregarded.

24  You are to decide the case solely on the evidence presented

25  here in the courtroom.  Now there are two kinds of evidence,

1    direct and circumstantial.

2         Direct evidence is direct proof of a fact, such as

3    the testimony of an eyewitness.

4         Circumstantial evidence is proof of one fact or --

5    which you could conclude -- from which you could conclude

6    another fact exists.  The very common illustration of

7    circumstantial evidence is, if the weather is clear when you go

8    to bed at night, and there is snow on the ground in the

9    morning, you may surmise that it snowed during the night.

10        I will give you further instructions on these, as

11   well as other matters, at the end of the case.  Keep in mind

12   that you may consider both kinds of evidence.  It will be up to

13   you to decide which witnesses to believe, which witnesses not

14   to believe, or how much of any witness's testimony to accept or

15   reject.

16        I will give you guidelines for determining the

17   credibility of witnesses at the end of the case.  This is, as I

18   have said and said, a civil case.  In a civil case, the

19   plaintiff has the burden of proving his case by what is called

20   a preponderance of the evidence.

21        This means that the plaintiff has to produce evidence

22   which, considered in light of the facts as you find them, leads

23   you to believe that what the plaintiff claims is more likely

24   true than not.  To put it differently, if you were to put the

25   plaintiff's and the defendants' evidence on both sides of the

1    scale, one side plaintiff, one side the defendant, plaintiff

2    has to make the scale tip a little on his side.

3        If plaintiff fails to meet that burden to make it tip

4    on his side, your verdict must be for the defendants.

5        Some of you, particularly those who have sat on

6    criminal cases, will know of something called proof beyond a

7    reasonable doubt.

8        That requirement doesn't apply in a civil case.  So

9    you can just place that out of your mind.  In this case, Mr.

10   Efaw claims that his civil rights were violated when Police

11   Officers Ward, Rhodunda, Elmore and Langan used excessive

12   force, which included the use of a canine police dog, when they

13   arrested him.

14       He also claims that the defendant, Falls Township,

15   failed to train its police officers in the proper methods for

16   dealing with suspects under the same circumstances as Mr. Efaw.

17   It will be up to you to decide whether the force used by the

18   officers during the arrest was excessive, and whether the

19   Township properly trained its police officers.

20       The police officer defendants claim that they did not

21   use excessive force, under the circumstances.  Therefore, they

22   claim that Mr. Efaw's civil rights were not violated.  And I

23   will give you detailed instructions on the law at the end of

24   the case.  And those instructions will control your

25   deliberations and decision.

1          But in order to help you follow the evidence, it is

2    important to keep in mind that the plaintiff must prove by a

3    preponderance of the evidence, one, that the defendants were

4    acting under the color of state law.

5          And, two, while acting under the color of state law,

6    they deprived Mr. Efaw of a Federal Constitutional Right.

7          Additionally, Mr. Efaw alleges that the police

8    officer defendants actions constituted assault and battery.  I

9    will charge you further on all of these subjects at the

10   conclusion of the trial.

11         You will be permitted to take notes during the trial.

12   Note pads and pens were distributed to each of you.  You should

13   immediately write your name on the outside of the materials.

14   It is your choice whether or not to take notes.  You're not

15   required to do so.

16         How many you take, if any, is entirely up to you.  If

17   you take notes, please be sure not to become so focused on the

18   note taking that your attention is distracted from hearing or

19   observing the witnesses and evaluating their credibility, or

20   from getting an overall picture of the case.

21         Your notes are merely memory aids.  They're not

22   evidence, nor the official record.  Whether or not you take

23   notes, you should rely on your own memory of what was said.

24   Notes are only to assist your memory.  Jurors who do not take

25   notes, or take few notes, should not permit his or her

1   independent recollection of the influence (sic), to be

2   influenced in anyway by the fact that other jurors are taking,

3   or have taken notes.  Give no more weight or less weight to the

4   view of a fellow juror, just because he did or did not, she did

5   or did not take notes.

6          You are not permitted to take your notes out of the

7   courtroom until deliberations.  Each time we have a recess,

8   your notes will be secured by the Court staff.

9          Your notes are confidential, they will not be

10  reviewed by the lawyers, the Court, or anyone else.  You may

11  not share your notes with other jurors until deliberation

12  begins.

13         The only notes you will use during deliberations, are

14  those you took during the trial on the materials we have

15  provided to you.

16         After the trial is over, and you have reached a

17  verdict that has been accepted by the Court, your notes will be

18  collected by my Court staff and destroyed.

19         Now a few words about your conduct as jurors.  First,

20  I instruct you that during the trial you are not to discuss the

21  case with anyone, not even among yourselves, or permit anyone

22  to discuss it with you.  Until you retire to the jury room at

23  the end of the case to deliberate on your verdict, you simply

24  are not to talk about the case.

25         If any lawyer, party or witness does not speak to you

1    when you pass them in the halls, ride the elevator, and the

2    like, remember, it is because they are not supposed to talk or

3    visit with you.

4          Second, do not read or listen to anything touching on

5    this case in anyway.  If anyone should try to talk to you about

6    it, bring it to my attention promptly.

7          Third, do not try and do any research or make any any

8    investigation about the case on your own.  And I say that

9    twice.  Do not try to do any research or make any investigation

10   about the case on your own.

11         Finally, do not form any opinion until all the

12   evidence has been presented.  Keep an open mind, until you

13   start your deliberations at the end of the case.  During the

14   trial, it may be necessary for me to talk with the lawyers out

15   of your hearing, by having a conference at sidebar, like you

16   saw this morning.

17         We are not trying to withhold information.  These

18   conferences are necessary for me to fulfill my responsibility,

19   which is to be sure that the evidence is presented to you

20   correctly under the law.

21         You have been chosen and sworn as jurors in this case

22   to try the issues of fact presented by the parties.  You are to

23   perform this duty without bias, or prejudice, or public

24   opinion.

25         Both the parties and the public expect that you will

1    carefully and impartially consider all the evidence in the

2    case, follow the law as stated by the Court, and reach a just

3    verdict.

4            Now, the trial will begin.  First, each side may make

5    an opening statement.  An opening statement is neither evidence

6    nor argument.  It is an outline of what that party intends to

7    prove, offered to help you follow the evidence.

8            Next, plaintiff will present his witnesses, and

9    defendant may cross-examine them.

10           The defendants will then have a opportunity to

11   present their witnesses, and plaintiff may cross-examine them.

12   After that, the attorneys will make closing arguments to

13   summarize and interpret the evidence for you.  The Court will

14   then instruct you on the law.

15           You will finally retire to deliberate on your

16   verdict.  Excuse me a second.  We have a little technical

17   glitch.

18           You will notice that you can use your screens.

19   Unfortunately, you are some of the few.  Mine isn't working and

20   neither are the panel's for the attorneys.

21                             (Recess)

22           THE COURT:  All right, my understanding is --

23                             (Pause)

24           THE COURT:  Please be seated, jurors.  I apologize

25   for the delay.  We are wired now, I understand.  Okay.

1  Counsel?

2          MR. LESSIN:  Thank you, Your Honor.

3          THE COURT:  Are you ready for your opening?

4          MR. LESSIN:  Yes, Your Honor.

5          THE COURT:  Very good.

6          MR. LESSIN:  May I proceed?

7          THE COURT:  You may.

8          MR. LESSIN:  Thank you.

9          Good afternoon.  May it please the Court, counsel,

10  members of the jury.  This is a case about police brutality and

11  the Fourth Amendment of the United States Constitution.

12          An amendment which our forefathers passed in order to

13  ensure that the very people that are sworn to uphold the law do

14  it and do it right.

15          Now before I tell you more about this case, I want to

16  reintroduce you to my client, Kevin Efaw.  Mr. Efaw's currently

17  23 years old.  At the time of this incident, Mr. Efaw was 20

18  years old.

19          He grew up in Bucks County.  He's a graduate of Bucks

20  County Technical High School.  He's currently employed, and he

21  worked while he was in high school.  You can see, or if you

22  haven't seen, you will see, Mr. Efaw is six foot five inches

23  tall, and he weighs about 200 pounds.  And that's what he

24  weighed back when this incident occurred.

25          But let me tell you about the incident, why we're

1    here.  This case starts really on September 30th, 2005.  And on

2    that date, Mr. Efaw made a lot of stupid mistakes.

3         A lot of stupid mistakes, which led to his arrest.  A

4    lot of stupid mistakes, which led to him pleading guilty.  And

5    a lot of stupid mistakes, which led to jail time, and some

6    other things that you're going to hear about, restitution and

7    things like that.

8         On that evening, Mr. Efaw went to his sister's

9    apartment, which was located about 15 minutes away, roughly,

10   from his mom and stepfather's house.

11        And you're going to hear, members of the jury, the

12   first stupid mistake he made was to drink alcohol.  He was 20

13   years old, he knew that he was underage.  He knew he shouldn't

14   drink, but he did.  And, members of the jury, he didn't just

15   drink a couple of cans of alcohol, he drank a lot of alcohol.

16        You're going to hear him tell you about it.  And then

17   he made another stupid mistake, and another stupid mistake.

18   And Mr. Efaw went, and when he decided to leave after drinking

19   for three or four hours, he got into his car, and started to

20   drive, knowing that he was feeling buzzed, knowing, as we all

21   do, that it's dangerous.  But feeling that he wasn't impaired,

22   in terms of driving.

23        And you're going to hear, members of the jury, that

24   he, on his way home, he stopped at a Sunoco, a local Sunoco,

25   where friends of his sometimes hang out, where he had worked.

1    And he's going to tell you that he was going to buy a cup of

2    coffee there, but he couldn't find his wallet, or he did find

3    some friends, and they -- one friend, I think, and he hung out

4    a little bit.

5          While he was in the Sunoco parking lot, you're going

6    to hear that he was noticed by Officer Rhodunda of the Falls

7    Township Police Department.

8          And Officer Rhodunda did his job, and decided, for

9    whatever reason, he'll explain it, that he wanted to follow Mr.

10   Efaw's vehicle, in his vehicle, in his patrol vehicle, when Mr.

11   Efaw drove out of the Sunoco station.

12         And that's exactly what Officer Rhodunda did.  And

13   Officer Rhodunda noticed, when he was tailing behind Mr. Efaw,

14   that Mr. Efaw was driving erratically.  And so Officer Rhodunda

15   did exactly what he should have done.  He turned on his lights,

16   and he went to pull over Mr. Efaw.

17         But Mr. Efaw made another stupid decision, in a

18   series of stupid decisions.  And instead of pulling over and

19   taking his medicine like a man, he decided to run, to elude the

20   police and drive towards his mom's house, his mother's house.

21         And so he sped the car up.  He's not exactly sure how

22   fast, but it was fast, maybe 70 miles an hour.  He doesn't

23   know.  And the car ended up, after a very short time frame,

24   going through the garage of a house, and into the backyard of a

25   trampoline -- into a trampoline.

1    But he wasn't hurt.  And he still decided, I'm going

2   to try and run away.  Where he was going, we'll ask him about

3   that, I don't know, but he was -- decided to run to his

4   mother's house.

5    And that's what he did.  Now, while all this is

6   happening, Officer Rhodunda is doing his job.  And he is -- he

7   stopped his car and started to get out of his car and started

8   to chase Mr. Efaw on foot.

9    Which is exactly what he should of done.  And Mr.

10  Efaw ran into his house, ran to the front door.  And you're

11  going to hear that he knocked on it.  It's like 1 or 2:00 in

12  the morning.  Nobody answers.

13   People in the house are asleep.  So he goes behind to

14  the back of the house.  And bangs on that door.  Nobody

15  answers, the people are asleep, or maybe they're starting to

16  stir, but, in any event, nobody answers the door.

17   So now this six foot five man tries to hide from the

18  police.  And as he's trying to hide from the police, because he

19  can now see Officer Rhodunda's flashlight, Officer Rhodunda

20  comes into the backyard and lets his fellow officers, as he

21  should have, lets them know exactly where he is, that he's in

22  foot pursuit, and that type of thing.

23   And then Officer Rhodunda sees Mr. Efaw and starts

24  shouting instructions to Mr. Efaw.  Which Mr. Efaw followed, to

25  a certain extent.

1    He got down on one knee.  And, in fact, Officer
2    Rhodunda was able to get one handcuff on Mr. Efaw's arm, before
3    two other Falls Township police officers showed up.  And when
4    the other two showed up, they made sure that Mr. Efaw was
5    handcuffed.
6    He was hit with a baton, he was maced.  And, guess
7    what?  Whether -- while it might have been harsh, that's not
8    why we're here today.
9    He ran, and he deserved it.  And he's going to
10   apologize, he'll never forget it.  Why are we here?  Where's
11   the constitutional violation?
12   Because after Mr. Efaw was handcuffed, he was
13   escorted to the front yard from the rear yard.  And he was
14   escorted by three police officers, as they should have.  One
15   was on one arm, one was on the other arm.  And one officer was
16   directly behind him.
17   And, members of the jury, when he got to the front of
18   the house into the street, a Officer Ward, with his dog, his
19   canine, Dante, while Mr. Efaw is handcuffed and surrounded by
20   police officers, Officer Ward gave the command to -- for the
21   dog to bite Mr. Efaw.
22   And you're going to see photographs of the bites in
23   the back of Mr. Efaw's leg.  A few days after the incident,
24   Mrs. Bonner, who is Mr. Efaw's mother, complained to the police
25   department.

1    You're going to see documents that the officers

2    filled out.  You're going to hear four different versions from

3    the police officers about what happened, why was a dog

4    justified.  Why was a dog justified?  And you're going to have

5    to make the decision whether the dog was justified because Mr.

6    Efaw was a dangerous person, at this point, when he's

7    surrounded by at least 3 -- well, actually, four police

8    officers, plus there was at least one more there at the scene,

9    and handcuffed and drunk, or whether the dog was really

10   punishment and retribution for what he did.

11   You're going to have to ask yourself that.  But the

12   story doesn't end there.  Because the police then decide to

13   take Mr. Efaw to the hospital, perhaps to get a blood test for

14   the DUI, perhaps to check the dog bites out.

15   But, in any event, the police decided to take him to

16   the hospital.  Frankford Bucks.  And Mr. Efaw's placed in

17   Officer Elmore's police car.  And Officer Elmore takes Mr. Efaw

18   to Frankford Bucks Hospital.

19   And they get to the parking area, and Officer Ward,

20   with the dog, Dante, followed in another police car.  You're

21   going to hear that there were shackles in Officer Elmore's car

22   that could have been used, if, in fact, Mr. Efaw was kicking

23   and everything like that.

24   But, in any event, the police say that Mr. Efaw

25   refused to get out of the backseat of the police vehicle at the

1    hospital.

2          So instead of grabbing his legs and trying to pull

3    him out, what Officer Ward decided to do, without the urging of

4    Officer Elmore, was to send in the dog after him, into the

5    backseat of the car.

6          And we maintain, members of the jury, that that is

7    another constitutional violation.  That that is excessive and

8    unreasonable, and meant nothing to do than -- more than to

9    punish Mr. Efaw for all that he did.

10          Thank goodness nobody died from his actions,

11    including himself.  And if they did, the law would have charged

12    him with more, and he would have suffered more.  In any event,

13    members of the jury, what are the defenses in this case?

14          Well the first defense -- I'm going to break them

15    down into two.  The first offense in the case is, the police

16    were acting reasonable, under the circumstances.

17          But you're going to see a police manual that Falls

18    Township has that governs what their own police officers do.

19    You're also going to hear about training that the police

20    officers have in something called force continuum.  Force

21    continuum.  That's something that's in their manual and it's

22    something they're trained about.

23          And, basically what it is, is, officers are supposed

24    to to obtain whatever objective they have, to use a minimal or

25    the least amount of force necessary to obtain the objective.

1   The continuum goes from number 1, which is police presence;

2   number 2, verbal commands; all the way down to number 6, which

3   is, the use of a gun.

4          On the police manual, on the force continuum, the use

5   of a dog is a 5.  You're also going to see, members of the

6   jury, the canine part of the manual.  The canine part of the

7   manual.  The canine part of the manual deals with fleeing

8   suspects.  It deals with drugs, explosives.  The one thing it

9   doesn't deal with, is a handcuffed prisoner in custody.  Not

10  mentioned at all.

11         The second defense that we believe they're going to

12  put up is essentially what I'll call is the, he deserved it

13  defense.  Meaning, the heck with the constitution, he was bad,

14  he deserved everything that he got.

15         But keep in mind, members of the jury, if they're

16  making this argument to you, and you're hearing testimony about

17  this, that we have a system which allows the judges and the

18  juries to punish.

19         We don't have a system where the police officers are

20  judge, jury and executioner.  I understand their job is

21  dangerous, but that's our system, that's what our forefathers

22  and the people that are serving this country have fought and

23  died for.

24         At the conclusion of this case, members of the jury,

25  we're going to ask you to compensate Mr. Efaw for the dog

1    bites, not for anything else.  And also to send a message to

2    the police department of Falls Township, and to all the police

3    departments that there are boundaries that everybody has to

4    follow, including the police officers of Falls Township.

5            Thank you.

6            MR. KARAMESSINIS:  Judge, if I may?

7            THE COURT:  Yes.

8            MR. KARAMESSINIS:  I introduced myself earlier.  My

9    name is David Karamessinis.  It's probably the hardest name

10   you'll hear.

11           It's interesting, I represent four officers, and what

12   I've heard from Mr. Lessin here today is basically, my client

13   was a bad guy, my client violated the law, but my client gave

14   up.

15           He's saying he gave up, and basically we wreaked

16   havoc on him.  And let's take a look at whether or not he gave

17   up, and the opportunities he had to give up.

18           He got drunk, he drank 13 to 14 beers.  He got behind

19   the wheel of a car, and he drove drunk through Falls Township.

20   He didn't have to do that, he could have pulled over.  But he

21   didn't pull over, he kept going, notwithstanding the lights and

22   sirens telling him to pull over.

23           Now Mr. Lessin indicated that he made a mistake and

24   hit a house.  I want to show you what he did.  This is a

25   picture of a house --

1          MR. LESSIN:  Objection, Your Honor.

2          THE COURT:  On what basis, counsel?

3          MR. LESSIN:  Well, first of all, they're not moved

4     into evidence yet.  This is the evidence we'll show -- he's

5     going to show photographs that we may not move into evidence.

6     I mean, this was not discussed with me before the opening.  So

7     I wouldn't know what photographs he's showing because --

8          MR. KARAMESSINIS:  Well I can tell him right now.

9     I'm going to show the pictures which we've exchanged.  Which

10    are pictures of a house.

11         THE COURT:  Show him -- it should have been --

12         MR. LESSIN:  Right, I agree with you, Judge.  I may

13    not have an objection, but I'm not going to allow him --

14         THE COURT:  Let him -- I would have discouraged any

15    use of this type of evidence, at this point.  On the other

16    hand, here we are and the two of you have not discussed it.

17         Show him what you have, sir, and that's it.

18                         (Pause)

19         MR. LESSIN:  Your Honor, may we see you at sidebar

20    for a minute?

21         THE COURT:  Yes.

22              (Sidebar Conference Under Seal)

23         THE COURT:  Jurors when we have these sidebars, as I

24    said to you in the opening instructions, they are usually

25    matters that pertain to procedures.

1    Legal procedures that are part of a presentation of

2    the case.  So not only will you hear the white noise, but

3    basically you have to -- you ignore the process.  Because I'm

4    dealing with the attorneys, and it really isn't going to be

5    anything instructive for you.

6    Just know that we try to move these along to have as

7    few as possible sidebars.  But if in fact an incident occurs,

8    as it just did, and there's a question, then I must go to the

9    side, that means the sound goes on, attorneys and I talk, make

10   a decision, and then we come back.

11   And this is where we are.  Thank you.

12   MR. KARAMESSINIS:  All right.  You will see pictures

13   later of what happened after he was diving 70 to 80 miles per

14   hour, you will hear testimony from Mr. Efaw himself.  In his

15   own neighborhood, mind you, not somewhere else, in his

16   residential neighborhood, a 25 mile and hour zone.

17   He takes off from the police.  And he drives up onto

18   a grass, and smashes into a garage of a house.  Drives through

19   the garage, into a backyard, hits a trampoline, and then his

20   car t-bones into a phone pole in the backyard.

21   Now, again, he had the opportunity, at that point, to

22   give up.  Did he give up?  No.  Did he go see if he had killed

23   anybody in the house?  No.  He takes off, jumping over fences,

24   after this fairly horrific car accident, which you're going to

25   see pictures of, the inside of his car, and he runs down the

1   block.

2          The officer's screaming at him, stop, stop, police.

3   He doesn't stop, he keeps running.  Now he apparently knew he

4   was running to his mother's house, but we didn't know that.  So

5   we have an officer in pursuit of somebody who's just done what

6   you've heard.  He runs through the side yard, into the

7   backyard, and hides up against the backdoor.

8          Six foot five kid, young kid, rangy, drunk.  The

9   officer sees him, and you've heard a little bit about what

10  happened in the backyard was.  It was a tussle.  He did not

11  agree to be handcuffed.

12         Again, he had a opportunity then to give up and say,

13  okay, you know, I was drunk, I did wrong, I smashed into a

14  house, I ran from the police, I drove from the police.  But he

15  doesn't.  He doesn't agree to be handcuffed.

16         If he had, we wouldn't be here.  We would have

17  handcuffed him, prosecuted him.  He would have pled guilty, as

18  he did, to various offenses, and we would have moved on.

19         But instead what he does is, he fights with the

20  police in the back, with three officers.  Now Officer Rhodunda

21  will tell you, he's in the middle, that he was exhausted, at

22  this point.

23         And he pretty much stood back to the side.  And the

24  other officers came into the backyard, and had to use some

25  force to get him into custody, because he was not agreeing to

1   be placed in handcuffs.

2          In fact, his mother testified at deposition, she told

3   him, Kevin, give up, stop fighting the police.  Because she's

4   apparently at the backdoor, at this point.  But he does not

5   relent.  He continues fighting and arguing, cussing, swearing

6   at the police, as they escort him out to the front.

7          Now is he walking like this with the police?  No.

8   He's digging in his heels.  You'll hear the officers explain, a

9   lot of times what people do when they don't want to be escorted

10  is, they pick their feet up, so you have to drag them.

11         He's doing this all the way out to the front.  Now

12  once they get to the front, plaintiff's counsel said there's

13  various stories that they tell about what transpired.

14         The one story he didn't tell you about, and what my

15  officers are going to explain is, these two officers are

16  walking him out into the street of this house -- right about --

17  right -- excuse me, right outside the front of this

18  individual's house, and they're walking towards a police car.

19         Of course, their goal, like they'll tell you, is, we

20  want to finish our shift without being hurt.

21                          (Phone ringing)

22         MR. KARAMESSINIS:  Is that me?  No.

23         THE COURT:  Somebody have a cell phone?

24         UNIDENTIFIED SPEAKER:  It's the TV.  The TV went on,

25  Your Honor.

1        THE COURT:  It's a phone?

2        UNIDENTIFIED SPEAKER:  No, it's a TV, Your Honor.

3        THE COURT:  It's the TV?

4        UNIDENTIFIED SPEAKER:  Yes.  But it says a phone

5    call, coming across the TV.

6        THE COURT:  Oh, I don't believe this.

7        MR. KARAMESSINIS:  I don't mind going --

8        THE COURT:  Keep going.

9        MR. KARAMESSINIS:  Keep going?  Okay.

10       THE COURT:  Please, ignore the phone call.  Or

11   whatever else it is.  Maybe this room is over-wired.  What can

12   I tell you.

13       MR. KARAMESSINIS:  In any event, as the officers

14   escort him towards this police car, to put him in the police

15   car, and they're goal then is to take him to the hospital,

16   because he's been in a very bad car accident, and they want to

17   take him there.

18       They take him to the police car, and one of the

19   officers lets go of him, because he's going to go and unlock

20   the back of the police car and let him in.

21       They lose control of him, at that point.  Because Mr.

22   Efaw takes the opportunity, again, not giving up.  He is

23   handcuffed, he whirls around and smashes the other police

24   officer into a side of a car, and continues to smash him.

25       We're talking about six foot five guy, a five foot

1    ten officer, Officer Elmore.  Gets slammed into the side of his

2    police car.  Right at the time that Officer Ward drives up,

3    he's a backup officer, he has his canine.

4         He drives up, and you're going to hear Officer Ward

5    explain, he says, look, I'm zoning in on an officer getting

6    slammed into the side of a car.  And I said, what did you do?

7    And Officer Ward will explain.  He says, I don't know this

8    guy's handcuffed.

9         He said, I'm coming on this scene, I don't see this

10   guy's hands.  All I see is an officer getting rammed into the

11   side of a car, and I'm zoning right in on that.  Are there

12   other officers around?  He'll say, yeah, there might have been,

13   he said, but I'm looking at my officer, and I'm going to use

14   that canine to protect my officer.

15        He took that dog out, he put the dog on his leg.

16   He's kicking him away.  And you know what?  That was the only

17   time we got him in control, is when we used the dog on him.

18        That dog wasn't put on him for fifteen minutes.  That

19   dog was put on him for fifteen seconds.  Bit him, and he'll

20   testify about how many times, since he's seen dog bites.  Two,

21   three times.

22        Finally, he calmed down to the point where we could

23   then take him and put him into a police car.  Where do we take

24   him?  Now you'd think, okay, the story ought to be over.  It's

25   not over.  It's never over with him, until he finally gets to

1   the hospital.

2           We get him to the hospital.  And Officer Elmore goes

3   to the back of the car to try to get him out.  By the way, I

4   didn't point out, Officer Elmore will explain, what's he doing

5   from the house to the hospital?  You f-ing cops, you f-ing

6   cops, I'll get you, blah, blah.  All this kind of chatter, this

7   same kind of behavior.

8           Officer Elmore, at the hospital, wants to take him

9   inside, get his wounds addressed.  Goes to open the back door,

10  Efaw kicked at Officer Elmore, tried to kick his hand off,

11  almost kicked him in the face.

12          Same kind of behavior that we had the whole time.  No

13  giving up.  This story that he gave up, not true.  Same time,

14  Ward comes up, sees that, puts the dog on him.  Luckily for Mr.

15  Efaw, actually, you know the way these younger kids, they wear

16  these pant legs, they're about the size of my waist, well

17  that's what kind of pants he had on.

18          Grabbed onto the pant leg actually, and pulled him

19  out of the car.  That's what the dog was trained to do.

20  Officer Ward will say that's what he's been trained to do,

21  which is to use the dog to extract somebody from a confined

22  space.

23          Now plaintiff's counsel made a point of saying, well,

24  you know, they had other options to do various things.  Officer

25  Ward will tell you, he's not going into a confined space, a

1    backseat, putting his head in there to try and grab, you get a

2    head butt, grab a gun, grab anything.  He's going to use that

3    dog to pull him out of the car.

4          And once he pulls him out of the car, he slides down

5    on his butt, like this.  Now he's looking face-to-face with the

6    dog, then he calms down.  That's the only two times.

7          Is it over then?  You would think it ought to be

8    over.  It's not over.  They take him into the hospital.  What

9    does he do?  He starts screaming f-ing nurse, f-ing this.  He's

10   screaming at the staff.

11         They're taking him in, so that they can get his

12   wounds addressed.  Wounds that he suffered in the car accident,

13   facial abrasions and the like, and the dog.

14         He won't concede.  He's still going through the same

15   thing.  The nurse asked that he be handcuffed.  He gets

16   handcuffed to the bed, at the nurse's request, because he's so

17   out of control.  And they deal with him in the hospital.

18         Only then does the lightbulb finally go on and he

19   starts apologizing profusely to Elmore and Ward for his

20   behavior.  At the very end of the night.

21         He ends up pleading guilty to DUI, fleeing and

22   eluding, resisting arrest, criminal mischief.  Because of his

23   behavior that night.

24         The dog was used as a mechanism to get him under

25   control.  It wasn't used to punish him.  It was used to protect

1    Officer Elmore from being slammed into the side of a car, and
2    it worked to that effect.
3           You know, you have a six foot five guy, you have
4    officers, it's like 1:30 in the morning, it's dark, they start
5    jumping on him to get him under control, the officer's behind
6    him, somebody can get hurt, somebody could get injured, and
7    you'll hear them talk about that.
8           They use something that had minimal damage.  It's not
9    like it tore up his leg and he's walking with a limp.  He's
10   fine.  You jump on somebody, they fall to the ground, you get a
11   concussion and the like.  That dog was a proper use of force,
12   under the circumstances, and it was the only thing that finally
13   got him under control.
14          When you go to deliberate, I'm going to ask you to
15   consider the evidence, and consider rendering a verdict on
16   behalf of the defendants.  Thanks.
17          THE COURT:  Thank you.  Okay.  Counsel, your
18   witnesses ready?
19          MR. LESSIN:  Yes, Your Honor.
20          THE COURT:  Mr. Efaw?
21          MR. LESSIN:  Your Honor, may I remove the blue folder
22   from the --
23          THE COURT:  Excuse me?
24          MR. LESSIN:  We have this mechanism setup, because we
25   couldn't get the --

1      THE COURT:  All right.  Whatever.  Have a seat.

2  You're going to be sworn in, Mr. Efaw.

3      THE CLERK:  Raise your right hand.

4  KEVIN EFAW, PLAINTIFF, SWORN

5      THE CLERK:  Please be seated.  State your full name

6  and spell your last name for the record.

7      MR. EFAW:  Kevin Michael Efaw.  E-F-A-W.

8      MR. LESSIN:  Hang on a second.  Judge, this screen

9  over here has a picture of the whole courtroom.  I don't know

10 if that's what the jurors -- are the jurors seeing that, as

11 well?

12     I don't know what you want to do with that, or do you

13 want to leave it like that.  It's the screen behind this

14 screen.

15     THE COURT:  Who's it for?

16     MR. LESSIN:  I don't think that's for anybody, I

17 think that was --

18     THE COURT:  All right.  Just turn it flat against the

19 back of this screen, and nobody will see it, I guess.

20     Can you turn it off?  Will that throw off the entire

21 system?  Just spin it a little.  I dread the idea of -- thank

22 you.

23     MR. LESSIN:  May I proceed, Your Honor?

24     THE COURT:  Yes.  Please do.

25                    DIRECT EXAMINATION

1    BY MR. LESSIN:

2    Q    Mr. Efaw, will you tell the jury where you live?

3    A    45 Twin Leaf, Bucks County.

4    Q    45 Twin Leaf Lane.

5              And how old are you now?

6    A    I'm twenty-three.

7    Q    And how old were you back in October of 2005?

8    A    Twenty.

9    Q    Are you married?

10   A    No.

11   Q    Do you have any children?

12   A    No.

13   Q    Where were you born?

14   A    Bucks County.  Same address 45 Twin Leaf Lane.

15   Q    Where did you grow up?  Bucks County?

16   A    Bucks County.  Yeah.

17   Q    Okay.  How far did you go in school?

18   A    Graduated.

19   Q    From where?

20   A    Bucks County Technical High School.

21   Q    Okay.  And after you graduated from high school, did you

22   continue your education?

23   A    It's in the process.  But, yeah.

24   Q    What are you trying to do?

25   A    Plumbing and heating.

1   Q   All right.  Were you employed as of October 1st of 2005?

2   A   Yes.

3   Q   And what did you do?

4   A   I worked at an Ace Hardware store in Thornridge

5   (phonetic).  And I worked at the Sunoco gas station, as a

6   matter of fact.

7   Q   Okay.  And are you currently employed?

8   A   Yes.

9   Q   Where are you employed currently?

10  A   I'm still presently at Thornridge Ace Hardware.

11  Q   All right.  And what do you do there?  What do you do at

12  the hardware store?

13  A   Retail, customer assistance, sales.

14  Q   How tall are you?

15  A   I'm six five.

16  Q   And how much did you weigh back in October of 2005?

17  A   About 200.

18  Q   Okay.  Have you ever, Mr. Efaw, been involved with karate,

19  or martial arts?

20  A   No.

21  Q   How about, did you play any sports in high school?

22  A   Just gym, no sports.

23  Q   Okay.  Any training in boxing, or anything like that?

24  A   No.

25  Q   All right.  Now let me direct your attention to the night

1   of October -- September 30th, October 1st, evening and morning.

2   Where did you drink alcohol?

3   A    At my sister's house.

4   Q    What's your sister's name?

5   A    Laurie Efaw.

6   Q    How much did you drink?

7   A    I'd say at least 12 or more beers.  Malt liquor.

8   Q    All right.  And over what period of time?

9   A    Under three hours -- maybe three, four hours.

10  Q    Okay.  Now how had you gotten to your sister Laurie's

11  apartment?

12  A    I drove there.

13  Q    And how far was -- is your sister Laurie's apartment from

14  your parents' house?

15  A    About 15 minutes.

16  Q    All right.  Now after you drank for three or four hours,

17  how did you feel?

18  A    Very buzzed.  But capable of -- you know, not feeling very

19  impaired to driving.

20  Q    All right.  You didn't feel impaired to drive, at that

21  point?

22  A    Right.

23  Q    Okay.  But you were buzzed?

24  A    Yeah.

25  Q    Okay.  All right.  So what time do you think you left your

1  sister Laurie's apartment?

2  A    I'd say about 11, 12:00 at night.

3  Q    All right.  And where did you go from there?

4  A    Well, I was proceeding home.

5  Q    And then what?

6  A    I stopped at a gas station, which is Sunoco.

7  Q    Okay.  Is that Sunoco where you worked?

8  A    Correct.

9  Q    And what were you doing there?

10 A    Well I figured I -- I mean, I wanted to get coffee, and I

11 tried to find my wallet.  I couldn't find my wallet.  You

12 know, so, I mean, I obviously had to leave there.  I was also

13 -- see if I could see some friends.

14 Q    Okay.  And did you in fact see any friends while you were

15 there?

16 A    I ran into one.  Yeah.

17 Q    Okay.

18 A    A girl named Sandra.

19 Q    Okay.  Did you talk to her?

20 A    Yeah.

21 Q    Okay.  All right.  Now when is the first time that you

22 noticed a police car?

23 A    Pretty much as soon a I pulled in, I acknowledged the

24 police car.

25 Q    Okay.  And where was the police car located when you first

1   noticed it, if you remember?

2   A    Right in front of Piazza's Bakery.

3   Q    Okay.  And after you saw the police car, what, if

4   anything, did you do?

5   A    Well, I acknowledged him.  And then I proceeded pretty

6   much -- I couldn't find my wallet, so I started feeling the

7   effects of the alcohol and I proceeded home.

8   Q    Okay.  Now what route did you take from the Sunoco to the

9   house, before you realized you were being tailed by a police

10  officer?

11  A    Well I was entering into my section at Thornridge.  And

12  then I made a right, and then I passed my street and proceeded

13  to the next one, just to see if the officer was following me.

14  Q    All right.  And what happened?  Was he following you?

15  A    Well -- yeah, oh yeah.

16  Q    Okay.  So then tell me what you recall happened after

17  that.

18  A    Well once I got like midway up the street, you know, I

19  began to panic.  I started --

20  Q    Why did you --

21  A    -- because I knew I was in trouble.  I knew I was -- you

22  know, I was on my first time ever getting myself in trouble,

23  and I bugged out.  And, you know --

24  Q    All right.  Have you -- were you in therapy at that time?

25  A    Yeah.

1    Q    What -- why were you in therapy?

2    A    Anxiety.

3    Q    Okay.  Who's your therapist?

4    A    Dr. Sarah Deering (phonetic).

5    Q    Okay.  So now tell -- now you see the police car behind

6    you, you're bugged out.  Tell me what happens next?

7    A    Well I pretty much panicked and I floored it, you know.

8    Just --

9    Q    All right.  Were you watching where you were going?

10   A    No.

11   Q    What were you doing?

12   A    I was focusing on the back mirror, on his lights.

13   Q    Okay.  And what's the next thing you remember?

14   A    A big crash.  And then getting out of the vehicle.

15   Jumping -- proceeding towards a fence, and I jumped the fence.

16   I remember falling and saying to myself, oh, my god, I'm

17   running from the police.

18        I just felt really stupid.

19   Q    Okay.  Now did you do damage to the house that you crashed

20   into?

21   A    Obviously, now I know, yes.

22   Q    All right.  You went back -- right after you got out of

23   jail, you went back and saw the house?

24   A    Yes.

25   Q    Okay.

1          MR. LESSIN:  Can we please --

2     BY MR. LESSIN:

3     Q    Is that the garage of the house that you ran into?

4     A    Yes.

5     Q    Were you injured in that initial impact with the house?

6     A    No.

7     Q    All right.  Did your air bag deploy?

8     A    Yes.

9     Q    Was there any blood on your air bag?

10    A    No.

11         MR. LESSIN:  Can we see --

12    BY MR. LESSIN:

13    Q    What's that, Mr. Efaw?

14    A    That's the interior of my vehicle, and that would be the

15    air bag on the left.

16         MR. LESSIN:  And, Your Honor, I think we gave you

17    copies of these things --

18         THE COURT:  Yes, you did.

19         MR. LESSIN:  So that's P-2.  I guess we -- I haven't

20    been -- P-1, just for the record, was the house.  The house

21    that you hit, correct?

22         MR. EFAW:  Correct.

23    BY MR. LESSIN:

24    Q    And then P-2 is the --

25    A    That's the inside of my vehicle.

1    Q    Okay.  And that silver thing, what is that?

2    A    That's the air bag.

3    Q    Okay.  Now P-3, what is that?

4    A    That's still the inside of it.  That's the air bag.

5    Q    Do you see any blood on there?  On the air bag?

6    A    No.

7    Q    Okay.  All right.  So now, after you get out of the car,

8    tell the jury what you did.

9    A    Well I pretty much panicked.  I knew I was in trouble.

10   Like I said, I'm not used to getting in trouble, and, you know,

11   it was like my first time.  And I went to where I felt was

12   safe, my mother's, you know.

13         I proceeded to my mom's to figure, you know -- any

14   other time I got in trouble, this is where I went, so I'm going

15   there.

16         You know, I was in that state of mind, at that point

17   in time, and my age, that I'm going to my mom's to see if I

18   could get my safe domain.

19   Q    Okay.  So now you run to your mom's.  Why don't you pickup

20   when you get to your mom's house, tell the jury what happened.

21   A    I went on, I knocked on the front door, nobody would

22   answer.  So I proceeded around the back, shake the handle.  I

23   banged on the door, real quick, and I actually squatted down

24   next to the fridge.

25   Q    Where was the fridge located?

1  A   Well if you're looking out the back end of my house, my

2  fridge would be on the lefthand side.  It would be on the left.

3  Q   Is it on the patio?

4  A   Yes.

5  Q   Okay.  So you're next to the fridge, on the patio, hiding

6  from the police officer, correct?

7  A   Correct.

8  Q   Okay.  What happens next?

9  A   Well the officer starts proceeding to pass by me.  I see

10 that he had either a gun or a flashlight, I can't really recall

11 what it was.  And I pretty much went out, like I -- I made a

12 step on the leaf, and I wanted to step out, because I knew I

13 was announced.

14      You know, I knew I was in trouble, I was ready to

15 face what I did wrong.  And I remember the officer facing me

16 and asked me to get on the ground.

17 Q   And what did you do when he said get on the ground?

18 A   I proceeded pretty much on my knee.  Yeah, I put my one

19 knee down, and put my hands up and --

20 Q   Did you throw any punches at the police officer?  Did you

21 try and run anymore?

22 A   No.

23 Q   Did you tackle the police officer?

24 A   No.

25 Q   Okay.  So now, tell me what happened?

1    A    Well I put my hands up, and then he got my one hand in a

2    cuff.

3    Q    Which hand?

4    A    I can't really recall.  But I think it was my right one.

5    Q    But you're not sure?

6    A    Right.  This is '05, so I'm going off that memory.

7    Q    Okay.  So now you got -- the officer has a cuff on one

8    hand.  Tell me what happens next?

9    A    Well he put it behind my back.  And just out of nowhere,

10   this other officer comes real hard and kind of throws my whole

11   chin down into the ground.  And goes to put me in cuffs, but

12   they had -- my hand was like stuck underneath.  They're trying

13   to pull the other one around.

14        I hear them telling me.  I hear my mom telling me to

15   cooperate.  My hand's jammed underneath my -- literally my

16   body.  So as I'm -- I'm trying to get pretty much restrained

17   there, these guys are pretty much hitting me with the batons,

18   and it's just going on from there.

19        Finally, they got me in cuffs.  And then the one guy

20   maced me right in my eyes, as soon as I was put in cuffs.

21   Q    Okay.  Well let's take a step back.  Just for

22   identification purposes, Mr. Efaw, what is that, P-4 -- P-4,

23   what is that?

24   A    That's my car.  The accident.  That's my car, actually,

25   after the fact, after the matter of me hitting the house.

1    Q   Okay.

2          MR. LESSIN:  Next.

3    BY MR. LESSIN:

4    Q   Do you recognize what this is?

5    A   That's where I was tackled, pretty much down --

6    Q   Is that the patio, the concrete?

7    A   Yeah.  That's my blood.

8    Q   Where's the blood coming from?

9    A   Me.

10   Q   From where.

11   A   Busted chin.  They bust my chin open, when they slammed me

12   on the concrete.

13   Q   Okay.

14         MR. LESSIN:  Next.

15   BY MR. LESSIN:

16   Q   Same thing?

17   A   Same.

18   Q   That's _P --

19         MR. LESSIN:  I'm sorry, Your Honor.  I'm losing --

20         THE COURT:  P-6.

21         MR. LESSIN:  P-6.

22   BY MR. LESSIN:

23   Q   Okay.  Now you said they hit you with batons?

24   A   Yes.

25   Q   Okay.  What position were you in, when the officers hit

1   you with batons?

2   A   Well there were several occurrences.  But I do recall

3   being on the ground with one of them, where they started

4   hitting my back, and my back of my legs.  I definitely recall

5   my legs, because obviously the back part there.

6         As you can see, I mean, indicated.  I have quite a

7   few bit -- of his knee jamming me in the back.  You know, I'm

8   trying to put my hand behind my back, and I'm stuck, I can't

9   move.  I mean, this is --

10  Q   How many officers are on top of you?

11  A   Three.

12  Q   Okay.  Now the circles, what do they represent on that

13  photograph, P-7?

14  A   Bat marks.  Hits.

15  Q   Who took the photographs?

16  A   My mother, after I got out of jail.  They're the after

17  facts.  That's three days after.

18  Q   Okay.  And now tell me about the pepper spray, the mace.

19  You mentioned that before, what's --

20  A   Well when they sprayed me in my eyes, obviously, they took

21  me up.  I felt like I was almost being -- I felt violated, in a

22  way, but I was still cooperating, I'm still proceeding and want

23  to go to the vehicle.

24        So I'm working my way down, and I'm getting hit

25  consistently on the side yard, just left and right, knocking,

1    knocking my -- you know, definitely the back, and the bottom of

2    my legs.

3           And I'm pretty much being drugged up against my

4    stepfather's vehicle.  I'm walking --

5    Q   Wait a minute, hold on.  Before we get to the front yard,

6    I want you to talk about the pepper spray.

7    A   Right.  Well I was blindfolded.  I couldn't see nothing.

8    Q   After he pepper sprayed you?

9    A   Right.  I mean, obviously, somebody pepper sprays you in

10   the eyes, you're not going to see nothing.  I didn't clean it

11   out, or anything.  I'm walking blindfolded.

12   Q   All right.  So when they were walking you up front, to the

13   front of the house, how were your eyes feeling?

14   A   They hurt, really bad.  Stinging.

15   Q   Were you having difficulty seeing?

16   A   Yes.  Definitely.  Most definitely.

17   Q   And verbally, what kinds -- are your cursing?

18   A   I was very upset about the situation.  I'm still getting

19   hit.  I'm being taken down, I'm getting thrown up against my

20   stepfather's vehicle.  I'm upset.  I'm not gonna lie to you.

21   You know, I'm very upset.  I'm feeling mishandled.

22   Q   You feel like they were treating you too rough?

23   A   I felt violated.  Yes.

24   Q   Okay.  So now they get you out into the street.

25   A   Well they were originally taking me to the police vehicle.

1    Q    Right.

2    A    They turned me away from the police vehicle, I'm standing,

3    they were about to put me in, and I got pulled away.  And then

4    I was taken out to the street, where I was thrown up into the

5    freaking van like a rag doll.  And they put the dog on me.

6    Q    Who threw you into a van?

7    A    The officers.

8    Q    Which ones?

9    A    These two.

10   Q    Which two?

11   A    The bald man and the other, Officer Ward.  I just recall

12   -- I recall them all.  And it's very scary to see.

13   Q    All right.  So now they threw you up into a van, and what

14   point and time did you meet the dog?

15   A    Pretty much as soon as I was thrown up against the van.

16   It was when these man started hitting me with the baton, and

17   putting the dog on me.  And I had no reason why I'm getting

18   hit.  Why this dog's on my leg.  I'm asking them, please, get

19   the f-ing dog off.  I'm not gonna lie, I was cursing.

20        I'm upset because this dog is langering (sic) on my

21   leg.  I don't know why.  All I'm thinking is, I was

22   communicating with these guys, and something went wrong.

23   Q    All right.  Incidentally, in the backyard, Mr. Efaw, were

24   you crying?

25   A    Yes.  I was upset.

1    Q    Okay.  So now they -- what part of the leg did the dog get
2    you on?
3    A    My left.
4    Q    Okay.  Where on your left?
5    A    All in the back.  Up on top -- I got bite marks all over
6    it.
7    Q    The back of your leg?
8    A    Yes.
9    Q    Okay.
10   A    This one's from the concrete, that one's the head mark --
11   Q    Wait let's go slower, let's -- let me take you through it.
12            MR. LESSIN:  P-8, Your Honor, I believe we're on --
13            THE COURT:  No.  If you're looking at the leg, the
14   first one I show for that is P --
15            MR. LESSIN:  No, it would be the shoulder, Your
16   Honor.
17            THE COURT:  Oh, the shoulder.  Yes, P-8.
18            MR. LESSIN:  That's P-8.
19   BY MR. LESSIN:
20   Q    Okay.  Mr. Efaw, what is that?
21   A    That's the mark where they were trying to put the
22   handcuffs on me.  They actually had my one hand pretty much
23   behind my back, and it's dragging on the side there, because I
24   keep getting hit and I'm moving, obviously, so I'm getting
25   scratched up on my concrete.

1    Q    Okay.

2          MR. LESSIN:  Next.

3    BY MR. LESSIN:

4    Q    P-9.

5    A    That's where my head got slammed, because one officer came

6    up and literally popped his --

7          MR. LESSIN:  Your Honor, may the witness step down

8    and just -- there's several cuts on his forehead, one's on the

9    left side, one's on the right side.

10         THE COURT:  All right.  That's okay.  You can go down

11   there.

12         MR. LESSIN:  Thank you.

13         MR. EFAW:  This one here, that was when they first

14   got on my head.  I was face down, and they got me right here.

15   Now this was from the concrete itself, when my head was

16   actually being retained and held.  And then they pepper sprayed

17   me.

18         Obviously, you can see I'm going through the pain.

19   BY MR. LESSIN:

20   Q    All right.  Well let's go to the next photograph, this is

21   -- stay there.  Show them what you're pointing to.  The

22   shoulder --

23   A    All right.  The shoulder marks, they're clearly showing

24   you that I was being held down forcibly.  I was trying --

25   supposedly I struggled from me trying to get my arm out of

1    there, because it's jammed underneath me here.  I can't get it

2    out, they're all on top of me.

3           There's three other guys on top of me.  Legs, middle

4    and head.  I can't move.

5    Q   Okay.

6           MR. LESSIN:  Next.

7           MR. EFAW:  Same thing.

8    BY MR. LESSIN:

9    Q   What's --

10   A   This is all from them slamming pretty much on the ground.

11   Q   On the patio?

12   A   Yeah.

13   Q   It's concrete, right?

14   A   Yes.

15   Q   Go ahead.

16   A   That's the dog bites.

17   Q   Okay.  Now what part of your legs is that?

18   A   That's the back part.  This is the side of my leg, it's

19   actually the back of my leg.  Side image.  This is the front.

20   Q   Now what's that, Mr. Efaw?

21   A   It's canine bites all along my leg, the whole thing.

22          MR. LESSIN:  That's P-10, Your Honor.  I'm terrible

23   with --

24          THE COURT:  No, I think that is P-12.

25          MR. LESSIN:  P-12, I'm sorry.

1    BY MR. LESSIN:

2    Q   Now -- you know what, you may go back to the stand.

3        Okay.  So now, after the dog -- first of all, did you

4    know that you were being bit by the dog when you first felt

5    something?

6    A   Yeah, I did.

7    Q   How did you know?

8    A   Because it hurt really bad.

9    Q   But I mean, in other words, when was the first time you

10   saw the dog?

11   A   Pretty much when I turned around, when the thing bit me.

12   Q   Okay.

13   A   Like I turned real quick, because I felt a bite.

14   Q   Okay.  So just so -- I want to be clear, so just so we're

15   clear, you saw the dog, after you felt the bite?

16   A   Pretty much, I felt the bite, then I kind of peeked

17   through with, you know, because of the pepper spray, I can

18   barely see.  I was blind -- you know, like I said, going down

19   the whole thing, but I could barely peek out of my eyes, and I

20   did capture the moment of the dog bite.

21   Q   Okay.

22   A   That's when I --

23   Q   The dog bit you in the back of the leg, at that point?

24   A   Yes.

25   Q   Okay.  All right.  Now, at some point, did they get you

1   into the police car, after the dog bit you the first time?

2   A   After the fact of the dog biting me, several times, I was

3   taken to the police vehicle, and I recall getting inside of the

4   police vehicle and they closed the door on me.

5   Q   Okay.  And then -- now you heard counsel say that you were

6   cursing and saying F this and F that, do you recall what you

7   were doing in the back of the police vehicle?

8   A   I don't really recall.  I felt violated.  So if I did

9   curse, I'm not going to say I didn't.

10  Q   Okay.  All right.  So now you get to the -- the officer

11  drives you to the hospital, is that right?

12  A   Correct.

13  Q   Did you request to go to the hospital?

14  A   No.

15  Q   Okay.  Did you have an understanding why they were taking

16  you to the hospital?

17  A   Yes.

18  Q   Why?

19  A   Because of the dog and the pepper spray.

20  Q   Okay.  So tell me what happens then?

21  A   Well I go to step out of the vehicle --

22  Q   So -- I'm sorry.  So an officer drives you to the

23  hospital?

24  A   Yes.

25  Q   And then you arrive at the hospital, correct?

1    A    Yes.

2    Q    Now tell me what happens next.

3    A    The one officer opened the door, and made his remark, get

4    the fuck out of the vehicle.  So I did.  I proceeded to step

5    out.  I stepped out.  All I remember is him assisting me by my

6    arm, I'm getting ready to walk in.  Two minutes later, it gets

7    silent.  I wasn't looking back at him, I was just standing

8    there.  Boom, pretty much at the back of my head, the dog comes

9    back from behind on me.

10   Q    And then how many times did he get you that time?

11   A    I was in a state of shock, at that time.  I can't recall

12   how many bites I actually got.  All I know is, I was in a lot

13   of pain.  Because this dog is back on me.  Then finally he

14   pulled him back off.

15   Q    Where are the jeans that you were wearing that night?

16   A    The prison confiscated them.

17   Q    Did you ever get them back?

18   A    No.

19   Q    Did you ask for them back?

20   A    Yes.

21   Q    Okay.  Now you went to -- after you were arrested and you

22   went to the hospital, what happened next?

23   A    Well I do recall getting placed on the, in the handcuff.

24   I don't recall the nurse stating it, I just know they wanted to

25   do it to me.

1         They put in the handcuff.  I asked to speak alone

2    with the nurse.  And I had a specific officer look at me and

3    say, don't you dare.  Don't you dare say a damn thing.  And

4    that was it.

5    Q   All right.  From the hospital, where were you taken?

6    A   Pretty much back, you know, to the township.

7    Q   To the precinct?

8    A   Yeah.  To get booked and processed.

9    Q   Okay.  And did you spend time in jail -- or when's the

10   next time you were able to get out of the custody of the

11   police, put it that way?

12   A   Well pretty much when I went in front of the judge, and I

13   was sentenced, my -- I had three days, or whatnot, inside -- I

14   don't really recall.  I mean, it was -- it was a while ago.

15   It's rough for me, it's scratchy.

16   Q   That's all right.  Take you time.  Just -- they take you

17   from the hospital to the jail, right?

18   A   Right.

19   Q   Did you spend some time in the jail?

20   A   Yes.  Three days.

21   Q   How long?

22   A   Three days, and an additional 48 hours.

23   Q   That's what you were sentenced to?

24   A   Yes.

25   Q   What did you plead guilty to?

1    A    I really don't know what I pleaded guilty to.  All I know

2    is, I was sentenced three days there.  I was -- had an

3    additional 48.  I had 40 hours community service -- or 50 hours

4    community service.  I had 18 months probation.

5    Q    All right.  How about restitution?

6    A    Obviously, fines and restitution, I had, too.

7    Q    Okay.  And are you keeping up with that?

8    A    Yes.  Yes.

9    Q    Okay.  All right.  Now how long did it take the dog bites

10   to heal?

11   A    It took a while.  Quite a few weeks.

12   Q    All right.  And did you get any treatment for them, other

13   than what they did for you at the emergency room?

14   A    When I was in the jail, I got them re-wrapped, again,

15   because they were bleeding through their inmate clothes.

16   Q    Okay.  Now did you send an apology letter, at some point

17   in time?

18   A    Yes.  To Officer Rhodunda.

19   Q    Okay.  Officer -- was he the first officer that --

20   A    Yes.

21   Q    Okay.

22          MR. LESSIN:  And can we --

23   BY MR. LESSIN:

24   Q    Okay.  First let's --

25          MR. LESSIN:  This is P-13, I believe, Your Honor --

1     THE COURT:  14.  Is that the short note?

2     MR. LESSIN:  Yes, Your Honor.

3     THE COURT:  That's 14.

4  BY MR. LESSIN:

5  Q   Okay.  What is that, Mr. Efaw, do you see it?

6  A   Yeah.  This, yeah, believe it or not it's --

7  Q   Is that your mom's handwriting?

8  A   No.  I believe that was when I was on probation, they

9  wanted to recall it.  They just asked if I could write it more

10  informative, like more information about it.

11  Q   Okay.

12     MR. LESSIN:  Go to the next one.

13     MR. EFAW:  That's the letter I wrote.

14  BY MR. LESSIN:

15  Q   Okay.  And at the bottom you said, "my sincere apology,"

16  do you see that?

17  A   Correct.

18  Q   Okay.  And is that your handwriting?

19  A   Yeah.  That's my handwriting.

20  Q   Okay.  All right.

21     MR. LESSIN:  One moment, Your Honor.  Let me just

22  make sure I got --

23  BY MR. LESSIN:

24  Q   Was there a spitting incident at the hospital?

25  A   Yes.

1   Q   Why don't you tell the jury about that.

2   A   Well I would say, my eyes were still pepper sprayed then.

3   I can taste the pepper spray, and I recall spitting, not on the

4   floor, but on my lap.  And I recall the officer sitting there

5   saying, did you just f-ing spit on the floor?

6           I said no I just spit on my lap.  He said, you f-ing

7   do that again -- don't you f-ing do that again.

8   Q   Why did you spit into your lap?

9   A   Because I had to clean the saliva.  I had -- I was too

10  bloody.  I had blood and I had pepper spray and everything.  I

11  couldn't --

12  Q   So why didn't you just spit on the floor, then?

13  A   Because I have more respect then that.

14          MR. LESSIN:  No further questions, Your Honor.  Thank

15  you.

16          THE COURT:  Thank you very much.  Cross?

17          MR. KARAMESSINIS:  Thank you, Judge.  I'll just get

18  organized here for a second, if I could.

19                          CROSS-EXAMINATION

20  BY MR. KARAMESSINIS:

21  Q   Mr. Efaw, you mentioned earlier that you were suffering

22  from some kind of anxiety, is that right?

23  A   Yes.

24  Q   Were you taking anxiety medication for that?

25  A   Yes.

1  Q   Okay.  Isn't it -- weren't you told by your doctor that

2  you're not supposed to drink when you're on anxiety medication?

3           MR. LESSIN:  Objection, Your Honor.

4           THE COURT:  All right.  On what basis?

5           MR. LESSIN:  Well he's told -- was he told by his

6  doctor is hearsay, first of all.  The doctor's not --

7           THE COURT:  Okay.  As a result of the doctor.

8  BY MR. KARAMESSINIS:

9  Q   As a result of meeting with the doctor, was it your

10  understanding that drinking and taking medication was not an

11  appropriate thing to do?

12  A   Not at that point in time.  I didn't really think about it

13  that much, to tell you the truth.

14  Q   Okay.  Now you mentioned that you drank.  Do you remember

15  telling me at deposition that you drank 10 beers and a 40

16  ounce?

17  A   Yes.

18  Q   Okay.  And this --

19           MR. LESSIN:  Objection.  Your Honor, if he's going to

20  quote a deposition, he's got to give me a page and a line.

21  And, I mean, that's the way.

22           THE COURT:  Except that he recalled that he said

23  that.

24           MR. LESSIN:  Okay.

25           THE COURT:  We're not in conflict, yet.

1      MR. LESSIN:  That's true.  All right.

2      THE COURT:  Thank you.  Overruled.

3   BY MR. KARAMESSINIS:

4   Q    And the kind of alcohol that you drank that night was malt

5   liquor, is that right?

6   A    Yes.

7   Q    And malt liquor is probably twice the alcohol content of

8   regular beer, isn't that right?

9   A    Yes.

10  Q    Okay.  So you had, let's see, 10 cans of malt liquor, plus

11  a 40, so that's thirteen and a half beers, right?

12  A    It's around that.

13  Q    About that.  And the alcohol content would be twice a

14  regular beer.  So if we do it in regular beer context, that

15  would be about 25 beers, is that right?

16  A    I would assume so.

17  Q    Okay.  Now you've told this jury here today that you did

18  wrong, and you understood that, but that you eventually

19  cooperated.  That's really what your story is, isn't it?

20  A    A hundred percent, yes.

21  Q    Okay.  Let's take a look at a couple of pictures, which I

22  was going to show earlier, and see if you remember -- that's a

23  picture of the remains of the garage that you smashed into in

24  that house, isn't that right?

25      THE COURT:  Okay.  Right now, we don't have a picture

1    of anything.

2              MR. KARAMESSINIS:  No, this was --

3              THE COURT:  Oh, it's on mine?  Okay.

4              MR. KARAMESSINIS:  If the jurors can see it, and the

5    witness can see it --

6              THE COURT:  That's okay.  I think I see it now.  Ah,

7    yes.

8              MR. KARAMESSINIS:  Oh, I'm sorry, yeah.  I think we

9    have to get that monitor on.

10             THE COURT:  Okay.  Saw it.  Do you see it?  Is it on

11   yours?

12             MR. EFAW:  No.

13             THE COURT:  See what's wrong with his.  Thank you.

14   It's not on that one.  Is it on yours?  They said they have it

15   on their screen, and I have it on mine.

16             MR. LESSIN:  It's not on our screen, Your Honor.

17             THE COURT:  Pardon me?

18             MR. LESSIN:  Our screen doesn't work.  We were

19   relying on this one.

20             THE COURT:  I don't know why that one's not working.

21   Is it on that one?

22             MR. KARAMESSINIS:  It's on this one here.

23             THE COURT:  Can you point from that one, if that's

24   what you plan to do?

25             MR. KARAMESSINIS:  I'm not having a problem with it.

1    But I think Jeff can't see that one.  And I'll see if I can --

2              MR. LESSIN:  It's by Mr. Richter --

3              MR. KARAMESSINIS:  Okay.  All right.

4              THE COURT:  Okay.  Good.

5    BY MR. KARAMESSINIS:

6    Q   Now this is the garage that you drove your car through

7    that night, is that right?

8    A   Yes.

9    Q   And actually, just, let's get this marked for

10   identification.

11             MR. KARAMESSINIS:  Chris, what was this?

12             MS. MUNION:  D-1.

13             MR. KARAMESSINIS:  D-1.  Thank you.

14   BY MR. KARAMESSINIS:

15   Q   And this is another picture, this is what -- this is a

16   look at the remains of the garage from the back of the house,

17   is that right?

18   A   Yes.

19             MR. KARAMESSINIS:  And I'll mark that as D-2, Judge.

20             THE COURT:  Okay.

21   BY MR. KARAMESSINIS:

22   Q   And this here is a picture of the remains of the garage,

23   looking at it from kind of in the middle of the backyard, is

24   that fair?

25   A   Yeah.

1    Q   Okay.  And you saw these pictures -- you saw the damage

2    that you inflicted the following day, is that right?  Or a

3    couple --

4    A   After I got out of jail.

5    Q   Oh, after you got out of jail?  It still looked like this,

6    after you got out of jail?

7    A   It was very similar to that, yeah.

8    Q   Okay.  Now the picture here, we see, which we're going to

9    call D-4, that shows some of the shrubs that were adjacent to

10   this garage that you took down in the course of going through

11   the garage, is that right?

12   A   Yes.

13   Q   Okay.  And this is a picture of your car after you went

14   through the garage, smashed into the trampoline, and didn't you

15   also hit this phone pole, right there?

16        Isn't that why your car's got that indent right in

17   the middle of it?

18   A   No.  I came close to the phone pole.  Fortunately, I

19   didn't hit it.

20   Q   Okay.  That was --

21        MR. KARAMESSINIS:  That was 5?  I think, Jeff, this

22   is our worst talent, trying to keep track of the numbers.

23   BY MR. KARAMESSINIS:

24   Q   Next one is a picture that your counsel showed you

25   earlier, D-6.  Now this picture shows some remains of some

1   shrubs that look like that -- they ended up inside your car.

2   Is that what happened?  That ended up inside your car?

3   A   Well I hit a tree, I would assume that's probably what did

4   happen, yeah.

5   Q   Okay.  So part of those trees ended up coming inside your

6   car, as you went through, is that right?

7   A   Well the window was cracked.

8            MR. KARAMESSINIS:  Judge, I think if we could have

9   him maybe -- put this further back.

10           THE COURT:  Yeah.  Just a little farther back.  You

11  don't have to -- it's very sensitive.  So if you can backup a

12  little, you'll be fine.

13           MR. EFAW:  All right.  I'm sorry.

14           THE COURT:  That's okay.

15  BY MR. KARAMESSINIS:

16  Q   You never checked to see if anybody had been hurt or

17  killed in that house that you went through, did you?

18  A   Afterwards.

19  Q   I mean, that night, at the time you smashed through the

20  house, you didn't go and see if anybody had been hurt or

21  killed?

22  A   No, I was intoxicated.

23  Q   Okay.  All right.  And when those trees -- when you hit

24  those shrubbery, the shrubbery, part of that shrubbery came

25  into the window and slapped you in the face, isn't that right?

1    A    No.

2    Q    All right.  Let me show you your deposition.  Do you

3    remember when I took your deposition, you raised your hand --

4    A    I do.  But I don't recall it slapped me in the face.  I

5    recall it scattering on me.  Scattering.

6    Q    Okay.  Well let's go with that, then.  So you do remember

7    portions of the branches, doing what to your face?

8    A    Just slightly caressing on my face.  That's it.  When I

9    went by, obviously the tree, when you go at a fast rate, it's

10   -- I could feel what it was.  It almost felt like a bunch of

11   little dots on my face, just going across.

12   Q    And did that happen as you drove through the tree area by

13   the garage, is that when you felt that?

14   A    Knowing now, yes.

15   Q    I'm sorry?

16   A    Knowing now, yes.

17   Q    Now you know yes.  Okay.  All right.  Do you know what

18   parts of your face it hit, or was it pretty much all over?

19   A    Just cheeks.

20   Q    Okay.  Now the night of this incident, you didn't examine

21   the inside of your car to see if there was any blood on it, you

22   just got out of your car and fled, right?

23   A    Correct.

24   Q    Okay.  And when you were running away, you heard the

25   police officer yelling at you to stop, stop, right?

1   A   Yes.

2   Q   And you didn't -- you continued to run as fast as you

3   could to get away, right?

4   A   Right.

5   Q   Okay.  Now you had the opportunity to stop and cooperate

6   then, but you didn't cooperate.  Is that because you were still

7   drunk, at the time?

8   A   I blame it more on my stupidity -- yes, obviously, through

9   drinking.

10  Q   Well do you think it was because, perhaps you had had the

11  equivalent of 25 beers, which is a case, that might have been

12  why you continued to run away?

13  A   I wasn't using my mind.

14  Q   Okay.

15  A   I wasn't using my mind.

16  Q   Okay.  So, at that point in time, you weren't using your

17  mind, so you weren't cooperating with the police, because they

18  were telling you to stop, right?

19  A   I was panicking.  I wasn't --

20  Q   Okay.

21  A   -- not cooperating.  I was panicking.

22  Q   In fact, I think you described it earlier as, you bugged

23  out, right?

24  A   Pretty much.  Bugging out, is a state of panic.  It's what

25  I did.

1   Q   Okay.  Now you end up running into your backyard, and you

2   hide up against the backdoor, like your counsel indicated, is

3   that right?

4   A   No.  I squatted down by the back door.

5   Q   You squatted down by the back door.  In an attempt to hide

6   from the police?

7   A   Pretty much.  Yes.

8   Q   Okay.  Now --

9   A   Until they came.

10  Q   Excuse me?

11  A   Until they came.

12  Q   Until they came.

13  A   Yes.

14  Q   Okay.  Now you smash into a house, you drove 70 or 80

15  miles per hour, you ran from the police, and you're telling the

16  story now that, suddenly a lightbulb went off and you decided

17  to cooperate.  Is that what you're saying here?

18  A   Correct.

19  Q   Okay.  So suddenly you begin to cooperate, and it took 3

20  officers to get you into custody.  Is that pretty much what I

21  understand?

22  A   Pretty much --

23  Q   Okay.

24  A   -- I mean, you got three on you.  You're trying to get

25  your hands tied up, you know, I know how it is, I do respect

1    the law.

2    Q    But -- oh, you do respect the law?

3    A    I do, very much respect the law.

4    Q    Okay.  Let me ask you this.  Your mother's looking at you

5    outside the backdoor window, probably a yard away, is that

6    right?

7    A    Correct.

8    Q    And she's yelling at you, Kevin, stop fighting with the

9    police, isn't she?  Do you remember her saying that to you?

10   A    She says, Kevin, get down, you're making matters worse.

11   Q    Okay.  So your mother believed clearly that you were not

12   cooperating with the police, right?  That's why she said, get

13   down, you're making it worse.  Isn't that right?

14   A    In a way, yes.

15   Q    So in a way you weren't cooperating.  Would you agree with

16   me there?

17   A    In a way, I think I was also in a panic state of mind.

18   Q    Okay.

19   A    That I'm kind of shocked about my actions of what I'm

20   doing.  Everything's coming to me now.

21   Q    Okay.  Now you eventually get handcuffed, is that right?

22   A    Correct.

23   Q    All right.  And do you remember, before you got

24   handcuffed, trying to kick the officers who came into the yard?

25   A    Absolutely not.

1   Q   All right.  So you don't remember that?

2   A   I don't recall kicking anybody.

3   Q   Okay.  You don't recall kicking anybody.  Okay.  You

4   remember cooperating?

5   A   I remember cooperating a hundred percent, yes.

6   Q   Let me just jump forward one minute.  Do you remember,

7   earlier you testified that at the hospital you were taken out

8   of the backseat of a car, correct, and you were just standing

9   there, minding your own business, remember?  And suddenly a dog

10  was put on you.  That's your story here today?

11  A   Correct.

12  Q   So if I'm you, there's an officer next to you, and you're

13  just standing here, kind of waiting to go into the hospital and

14  suddenly a dog comes up and bites you on the leg, is that your

15  story?

16  A   No.  I told you that some guy came from behind, kind of

17  hit me.  I'm not looking back.

18  Q   Oh, he hit you first.

19  A   And then the dog was put on me.  Yes.

20  Q   So an officer comes from behind, hits you, for no reason?

21  A   Somewhere around here.  Yes.

22  Q   Okay.  And then puts the dog on you?

23  A   Yes.

24  Q   Do you remember telling your mother that, in fact, the

25  officer used the canine to get you out of the backseat of a

1   car?

2   A    No.

3   Q    Do you know that she testified in a deposition that, in

4   fact, you told her that --

5           MR. LESSIN:  Objection, Your Honor.  Improper use of

6   a deposition.

7           MR. KARAMESSINIS:  He either knows of it, or he

8   doesn't.

9           THE COURT:  Yes.  Overruled.  I'll permit him to ask

10  whether --

11          MR. EFAW:  I don't recall it.

12  BY MR. KARAMESSINIS:

13  Q    Are you aware of the fact that your mother, in deposition,

14  testified that you told her that in fact you were in the

15  backseat of the car at the hospital, and that's when the dog

16  was used to pull you out of the car.

17          Do you remember?  Or are you aware that she testified

18  to that?

19  A    It's been a while.  I -- from my memory, I could have done

20  it.  But I'm not stating the fact as of this point that I did

21  it.

22  Q    So you don't really know what was going on at the

23  hospital, is that what you're saying here now?

24  A    No, I'm recalling the fact I do know I was bit.  But I

25  don't, recall because of the fact of the timing, the space

1    between.  You know, I don't know it all.

2    Q    Okay.  You don't know it all.  All right.  Now let's just

3    kind of turn back.  I just wanted to jump to that thing, for an

4    instant.  Back at your house, you're being walked out to the

5    front with the officers, correct?

6    A    Wait, say this again?

7    Q    Yeah.  After you were handcuffed in the back of the yard,

8    you end up being escorted to the front, right?

9    A    Yes.

10   Q    Okay.  And do you remember digging in your heels and

11   refusing to go with the officers?

12   A    No.

13   Q    Do you remember lifting your feet up, so that they had to

14   drag you?

15   A    No, I don't recall them dragging me.  I recall me trying

16   to walk with them, being blindfolded, in the dark.

17   Q    Being blindfolded?  Did somebody put a blindfold on you?

18   A    Pepper spray.

19   Q    Oh, the pepper spray.  Okay.  So if three other officers

20   are going to get on the stand, raise their hand, and promise to

21   tell the truth, and say that you were kicking, you were digging

22   your heels in, you were swearing at them, you were not

23   cooperating and resisting arrest the entire time from the back

24   to the front, that would be in error?  Is that what you're

25   saying?

1    A   I think if I was saying any curses, it was about the fact

2    of the pepper spray hurt so much, that I felt like I was

3    violated, because I was still getting beat.

4    Q   I understand that.  What I'm saying to you is, did you dig

5    in your heels, did you refuse to walk with the officers?  Or

6    did you cooperate?

7    A   I was trying to cooperate, the best I could.

8    Q   Okay.  All right.  Do you remember slamming an officer

9    into the side of your mom's van?  Do you remember that?

10   A   No.  I remember me being slammed up against the van.

11   Q   Okay.  All right.  The dog was used on you for probably 10

12   to 15 seconds, isn't that right?

13   A   To me, it felt like a good 15 minutes.

14   Q   Okay.  Is that -- now you're going to tell the story that

15   the dog bit you for 15 minutes?

16   A   At that point in time, I assume it probably would be less,

17   but to me, it felt like forever.

18   Q   Okay.  All right.  Now the scratches that we see on your

19   leg, they're not all dog bites.  Some of them are just

20   abrasions and cuts, isn't that right?

21   A   No.  They're all dog bites.

22   Q   So all of the marks on that leg are dog bites, is that

23   your story?

24   A   Yes.  A hundred percent.

25   Q   Then let me ask you this.  After your car accident, you

1    started jumping over chain link fences that separated the

2    various backyards in the homes adjacent to the home you smashed

3    into, right?

4    A    Correct.

5    Q    Do you think there's any chance that you might of perhaps

6    gotten a little bit of a cut, after 25 years of trying to jump

7    over fences?  Or do you think that's unlikely?

8    A    No.

9    Q    That's unlikely.

10   A    Very unlikely.  I'm six five.  Like I said my height does

11   count there.

12   Q    So you're telling this jury that you launched over it like

13   a deer, that's how you got over these fences?

14   A    Yes.

15   Q    Okay.  Do you remember screaming and swearing at a nurse

16   at the hospital?

17   A    No.

18   Q    All right.  So if a nurse comes in here and tells this

19   jury that's how you behaved to her, that would be a mistake?

20   A    I think I felt violated again.

21   Q    I'm not asking you about whether or not you felt violated.

22   I'm asking you as to whether or not you turned on a nurse who

23   was trying to take care of you, and told her to get the F away

24   from me, get out of here, and to such an extent that they

25   almost refused to treat you?

1          Is that true?  Did you act like that, or not?

2     A    Absolutely not.

3     Q    Okay.

4               MR. KARAMESSINIS:  Judge, once second please.

5                              (Pause)

6               MR. LESSIN:  Your Honor, can I see you at sidebar?

7               THE COURT:  Yes.

8                    (Sidebar Conference Under Seal)

9               MR. LESSIN:  May I get a copy of that, though, after

10    we're done?

11              THE COURT:  Sure.  Absolutely.

12              MR. LESSIN:  Thank you.

13              THE COURT:  Counsel will provide a copy.

14              MR. LESSIN:  Thank you.

15    BY MR. KARAMESSINIS:

16    Q    Mr. Efaw, if I put a document up here, can you see that?

17    Does that come on your screen?

18    A    Yes.

19    Q    Okay.  I want you to take a look at this.  This is the

20    guilty plea?  Do you remember pleading guilty to some of the

21    offenses that you were charged by these officers?

22    A    Yes.

23    Q    Okay.  Let's take a look at the first one.  It's called

24    fleeing, or attempting to elude police.

25              It says you, "while driving a motor vehicle,

1    willfully failed or refused to bring his vehicle to stop, or

2    otherwise did flee or attempt to elude a pursuing police

3    officer, when given visual or audible signals to bring the

4    vehicle to a stop."

5         You pled guilty to that, because you did not heed the

6    officer's lights and sirens, right?

7    A    Correct.

8    Q    Okay.  Now the second one, driving after imbibing alcohol.

9    That you did unlawfully drive a vehicle -- you see what's

10   circled at the end of that, "the actor's BAC was .14?"

11   A    Yes.

12   Q    Okay.  Now you weren't permitted to drink alcohol at all,

13   because you weren't of age, is that right?

14   A    Yeah.

15   Q    Okay.  Now is that what you pulled, a .14, or was it a

16   .16?  I can't remember what you testified to.

17   A    I guess .14.

18   Q    You're just not sure, or do you think that's right, .14?

19   A    Like I said, again, it's been a while so --

20   Q    Okay.  Now you also pled guilty to this charge at the

21   bottom, criminal mischief.

22        It says "Did intentionally damage real or personal

23   property of another..."

24        Whose property did you intentionally damage?  Was it

25   going through the house, is that what you pled guilty to?

1    A    Well causing the damage to the house that I hit.

2    Q    Causing the damage to the house.  Okay.

3    A    To the people, yeah.

4    Q    Okay.  Finally, let's go to the last page here.  Resisting

5    arrest.  It says "Did with the intent of preventing officers

6    Rhodunda, Langan and Elmore, from effecting a lawful arrest or

7    discharging any other duty, create a substantial risk of bodily

8    injury to these officers."

9         Is that what you did?  You created a substantial risk

10   of bodily injury to these police officers?  That's what you

11   did, right?  Because you pled guilty to it.

12   A    You could say a risk.  Yeah, I guess so.

13   Q    Well you did plead guilty to this, correct.  So you were

14   acknowledging that you were guilty, right?

15   A    I know I was guilty for my DUI.

16   Q    No, I'm not talking about that.  I'm talking about when it

17   says you created a substantial risk of bodily injury to these

18   officers.  You would agree that's what you did that night,

19   right?

20        Otherwise, you wouldn't have pled guilty.

21   A    I guess I put them at risk, yeah.

22        MR. KARAMESSINIS:  Judge, I want to get this marked.

23   Chris --

24        MS. MUNION:  D-7.

25        MR. KARAMESSINIS:  D-7?

1    BY MR. KARAMESSINIS:

2    Q   By the way, just a couple of questions about the

3    medication, the anxiety medication.  Do you remember what it

4    was that you were on?

5    A   Zoloft.

6    Q   Zoloft.  Do you remember what level what dosage?

7    A   A pill a day.

8    Q   Excuse me?

9    A   A pill a day.

10   Q   Okay.  Now as a result of this incident, you were required

11   to go for court ordered treatment with a psychologist to deal

12   with your bizarre reaction to alcohol, isn't that right?

13   A   Correct.

14   Q   Okay.

15       MR. KARAMESSINIS:  Judge, if I could have just one

16   minute to look at my notes.  I think I'm probably done.

17                         (Pause)

18       MR. KARAMESSINIS:  Let me just make sure I marked

19   these.  Because I always have a problem trying to keep track of

20   some of those documents.

21                         (Pause)

22       MR. KARAMESSINIS:  Should I show this to Ms. Money

23   (phonetic)?

24                         (Pause)

25   BY MR. KARAMESSINIS:

1    Q    I just want to go over --

2          MR. KARAMESSINIS:  Jeff, what was it that you had the

3    apology marked?  I don't want to mark it again, if you've

4    already marked it.  Do you remember what it was?

5          MR. LESSIN:  Probably P-14 and 15.

6          MR. KARAMESSINIS:  P-14 and 15?  Fifteen's the actual

7    letter, and P-14 is the note?

8          MR. LESSIN:  Yes.

9          MR. KARAMESSINIS:  Okay.

10   BY MR. KARAMESSINIS:

11   Q    This document, P-15, this is the apology that you wrote to

12   Officer Rhodunda, right?

13   A    Yes.

14   Q    Okay.  I just want to make sure that I've read this

15   correctly.  Can you read along with me?

16          "I would like to say I'm sorry..."

17          MR. KARAMESSINIS:  Can the jury actually read this?

18   Okay.

19   BY MR. KARAMESSINIS:

20   Q    (Reading)

21          "I would like to say I'm sorry for my bad judgment

22   and actions on October 1, 2005.  I should have used my god

23   given brain and never drunk.  My judgment was very bad, as well

24   as my behavior.  I sorry you seen the immature actions that

25   night.  I am usually a very bright person, and due to drinking

1   my mind was not its own.  I really did a stupid thing that

2   night.  I will always regret my actions.  I will never forget

3   for the rest of my life.  I am very blessed to be alive, as

4   well as no one was hurt or killed, except you, by my stupidity.

5   I have learned, unfortunately, the hard way, I will never drink

6   and get behind the wheel again."

7           You indicate here that the officer was injured.

8   What's your understanding of his injury?

9   A    From -- well -- I care.

10  Q    It's the officer who chased you on foot, right?

11  A    Oh, apparently he was -- from what I was informed, he was

12  out of work for hitting his knee on a piece of concrete.

13  Q    All right.  Did you have any understanding that he fell

14  into a hole of one of the trees you ripped out, on your way

15  through the house?

16  A    No.

17  Q    Okay.

18          MR. KARAMESSINIS:  I don't have anything else, Judge.

19  Thanks.

20          THE COURT:  Very good.  Thank you.

21          Redirect?

22          MR. LESSIN:  Redirect.  Very short, Your Honor.

23          THE COURT:  Of course.

24                    REDIRECT EXAMINATION

25  BY MR. LESSIN:

1   Q   Mr. Efaw, were you ever charged with aggravated assault?

2   A   No.

3   Q   Did you ever slam, using your back, if I may, did you ever

4   -- could you stand up one second.  I think the description in

5   the opening was that you're handcuffed, and you're slamming

6   someone into a van, is that right?

7   A   That's what it says.

8   Q   Did you ever do that?

9   A   No.

10  Q   So if you're right, that was a story, right?

11  A   Yes.

12  Q   Okay.

13          MR. LESSIN:  Okay.  No further, Your Honor.

14          MR. KARAMESSINIS:  Nothing further, Judge.

15          THE COURT:  Very good.  Thank you very much.  You may

16  be excused from the testimony.  The next witness, counsel?

17          MR. LESSIN:  Yes.  Your Honor, I'd like to call

18  Officer Rhodunda as of cross.

19          THE COURT:  Officer Rhodunda, which is on --

20          MR. KARAMESSINIS:  Would you explain to them what

21  that means?

22          THE COURT:  You want an offer of -- oh, you want me

23  to explain.  Oh, I will.

24          MR. KARAMESSINIS:  Could you please explain to them

25  why --

1    THE COURT:  Okay.  Jurors, it is possible for one

2  counsel to call the witness of the opposing counsel as of

3  cross, as it will be.

4    So that what you will hear, are questions that

5  require ostensibly a yes or a no, rather than open questions,

6  where do you live, how were you driving that night, that sort

7  of thing.

8    It is done on the concept that the officer, or any

9  witness who is called by the opposing counsel, believes that

10  the witness will not necessarily be cooperative.  Even though

11  the witness may be cooperative.

12    So the questions will be very specific to the

13  officer, and his testimony is basically being used in the

14  plaintiff's case.

15    Okay?

16    MR. LESSIN:  Is he sworn in, Your Honor?  Oh --

17    THE COURT:  Yeah, I wasn't sure that -- do you have

18  any questions about what I've said?  Very good.

19    MR. LESSIN:  That he's been sworn in, I'm sorry --

20    THE COURT:  No, not yet.

21  JEFFREY RHODUNDA, PLAINTIFF'S WITNESS, SWORN

22    THE CLERK:  Please be seated.  State your full name,

23  and spell your last name for the record.

24    OFFICER RHODUNDA:  Jeffrey Michael Rhodunda,

25  R-H-O-D-U-N-D-A.

1          MR. LESSIN:  May I proceed, Your Honor?

2          THE COURT:  Yes, you may.

3                          DIRECT EXAMINATION

4    BY MR. LESSIN:

5    Q    Let me start off by asking you this.  You were here for

6    the opening statement, right?

7    A    Yes.

8    Q    Have you had the opportunity to review your deposition?

9    A    Yes.

10   Q    Okay.  And you would agree with me that, at least your

11   vision didn't see my client banging Officer Elmore against the

12   van.  Isn't that right?

13   A    Repeat the question.

14   Q    You never saw my client banging Officer Elmore against the

15   van, isn't that right?

16   A    No.

17   Q    No, it's not right?

18   A    No, it's not right.

19   Q    Okay.  You saw Officer Elmore banging -- being banged by

20   my client against the van?

21   A    Yes.

22   Q    Okay.  And is that what you testified to in your

23   deposition?

24   A    Yes.

25   Q    Did you ever see the dog?

1    A    After he was placed in the police vehicle.

2    Q    Did you see the dog -- did you observe the dog bite Mr.

3    Efaw?

4    A    No.

5    Q    Okay.  If the dog was biting Mr. Efaw, while he's being

6    knocked against the van -- Elmore's being knocked against the

7    van, why didn't you see the dog?

8    A    Because I was behind -- I wasn't right up with Officer

9    Elmore and Mr. Efaw.  I was a distance back from them, walking

10   down towards them.

11   Q    Did you ever lose sight of Mr. Efaw, from the time that

12   you left the backyard, until the time that you got to the front

13   yard?

14   A    No, I did not.

15   Q    Okay.  So you never lost sight of them.  If you never lost

16   sight of Mr. Efaw, how is it that you didn't see the dog.

17   A    Because he was coming from the opposite direction, towards

18   us, and I was behind him.

19   Q    All right.  Officer, let's do it this way.  Let me -- I'm

20   going to get back -- I'm going to get back to you on this

21   slamming of the body.  But let me go through this.  You're --

22   state your full name.  I don't know if I got that from you.

23   A    Jeffrey Michael Rhodunda.

24   Q    Okay.  And who are you employed by?

25   A    Falls Township Police Department.

1  Q   Now when you joined Falls Township, did you have to swear

2  an oath?

3  A   Yes, I did.

4  Q   What was your oath?

5  A   To uphold the law of the Commonwealth.

6  Q   Okay.  And also, you plan to be honest when you testified

7  in a Court of law, correct?

8  A   Correct.

9  Q   Okay.  Did you have any canine training?

10  A   No.

11  Q   Did you learn anything about force continuum when you were

12  training?

13  A   Force continuum with canine, or force continuum as a

14  police officer?

15  Q   Force continuum in general.

16  A   In general?  Yes.

17  Q   What is force continuum?

18  A   From police presence, up to deadly force.

19  Q   Okay.  Is that something that's in the manual?

20  A   Yes.

21  Q   All right.

22        MR. LESSIN:  Mark, can you put it up?  First page.

23  BY MR. LESSIN:

24  Q   Is this the -- can you see that?

25  A   Yeah.

1    Q   All right.

2              MR. LESSIN:  Your Honor, may I move over here?

3              THE COURT:  Yes.

4    BY MR. LESSIN:

5    Q   Okay.  This is force continuum, right?

6    A   Yes.

7              MR. LESSIN:  Can you all see this?  No?  See, we

8    tried to -- they can't see it, Judge.  I don't know -- we had

9    where it was -- can we make it larger?

10             UNIDENTIFIED SPEAKER:  How about this?

11             If you want to put it on the Elmo --

12             MR. LESSIN:  Can you show me how it works?

13             THE COURT:  Yes.  That would work.  There you go.

14   Now it's going.

15             THE COURT:  It's zooming here.

16             UNIDENTIFIED SPEAKER:  Is it?  Oh, I'm looking at the

17   wrong one.  Has it zoomed on yours?

18             THE COURT:  You don't have it, either, Officer?

19             OFFICER RHODUNDA:  No, I do not, Your Honor.

20                          (Pause)

21             MR. KARAMESSINIS:  It was up when I used it.  How

22   about now?

23             THE COURT:  Now it's up.

24             MR. KARAMESSINIS:  All right.  See, I'm helping my

25   opposition out here.

1    MR. LESSIN:  Yeah, you got to zoom it back out.

2    MR. KARAMESSINIS:  I got to zoom it out?  Okay.

3    MR. LESSIN:  It's too close.

4    MR. KARAMESSINIS:  Is that out?

5    MR. LESSIN:  More.  Right there's pretty good.

6    THE COURT:  There you go.

7    MR. LESSIN:  Okay.  You got it.

8  BY MR. LESSIN:

9  Q   Would you tell the jury what this is?  This is page one of

10  your -- the Falls Township Policy Manual, correct?

11  A   Correct.

12  Q   All right.  And this is called force continuum?  Do you

13  see that?

14  A   It's force continuum, subsection A, correct.

15  Q   Yeah.  Subsection A.  And there's levels, do you see that?

16  A   Yes, I do.

17  Q   All right.  And then it says, "A law enforcement

18  officer..."

19        This is above it.

20        "A law enforcement officer as defined in Chapter 5 of

21  the Pennsylvania Crimes Code, shall only utilized deadly force

22  when necessary and justified to effect lawful objectives in

23  conformance to the provisions of the Pennsylvania Crime Code,

24  or a state and federal Court decision."

25        Do you see that?

1    A    Yes.

2    Q    Okay.  Now do you notice that for force number 5, that is

3    -- it says "temporary incapacitation impact tools."  Do you see

4    that?

5    A    Yes.

6    Q    Is that a baton?  An impact tool.

7    A    An impact tool, yes.

8    Q    A nightstick, is that an impact tool?

9    A    Yes.

10   Q    Less lethal ammunition.  Beanbags.  Do you see that?

11   A    Yes.

12   Q    And then it says canine unit, do you see that?

13   A    Yes.

14   Q    Officer, are you allowed to use a baton on a handcuffed

15   individual?

16   A    On a handcuffed individual?

17   Q    Yeah.

18   A    No.

19   Q    And that's in your manual, right?

20   A    Yes.  I believe so.  It's further in the --

21   Q    It's on page 16 of your manual, right?  And that's a level

22   5 weapon, is it not, the baton?

23   A    It's level five on the force continuum, correct.

24   Q    Right.  And you're not allowed to use those.  Just to be

25   clear, on page 16 of your manual it says:

1    "The baton should not be used to strike a handcuffed

2    suspect in custody."

3        Do you see that?

4    A   No, it's still on page --

5    Q   But that's what it says?

6    A   Yes.  Yes.

7    Q   you wouldn't argue with me on that one?

8    A   No.

9    Q   All right.  Incidentally, for level number 3, it says

10   "restraint and control."  Do you see that.

11   A   Yes.

12   Q   "Empty hands, escort holds, pain compliance."

13   A   Yes.

14   Q   What is that?

15   A   These are ways that we can use to get people that are not

16   compliant, compliant.  And to basically overcome the resistance

17   that we are met with.

18   Q   So what kind of hand holds do you know, or did you know?

19   A   Do I know -- some of the things they teach us in -- excuse

20   me -- defensive tactics, which could include the bending of the

21   wrist, get control of the thumb, some pressure points behind

22   the ears, underneath the chin, in the shoulder and so forth.

23   Q   Okay.  All right.  And were those types of holds available

24   to use against Mr. Efaw when he was being moved from the

25   backyard to the front of the house?

1    A    Not initially, no.

2    Q    After you had him handcuffed, were you able to -- could

3    you use those holds?

4    A    Well after he was handcuffed, I had no control over Mr.

5    Efaw whatsoever.

6    Q    I understand that.  But were you able -- could -- if you

7    elected to, could you have used the holds?

8    A    Observing Mr. Efaw's actions that night, no.

9    Q    Not -- what would have prevented you from -- well let me

10   ask you some of the holds.  Tell me, why couldn't you, I think

11   you said something with the thumb, tell me about -- tell me

12   some of the holds, again, and let me figure out why you can't

13   use some of the holds, when a guy's arms are behind his back.

14   A    Because they're part of his hands.  If his hands are

15   handcuffed, they're behind his back, you can't grab him.

16   Q    You can't grab his hands from behind --

17   A    Well, I mean, you can grab them, but to bend them, you

18   wouldn't be able to do it, because the gentleman has handcuffs

19   on.

20   Q    In other words, the handcuffs are on the wrist, right?

21   A    Right.

22   Q    And you can't bend any of his fingers?

23   A    Well I'm sure you could, but you mostly you just want to

24   gain control of the subject, you're not looking to grab his

25   fingers.

1    Q   I understand that, but one of these is pain compliance.

2    Other than -- give me another hand hold that you learned.

3    Let's forget that one, give me another one.

4    A   Bending of the wrist.

5    Q   Okay.  Now are you telling me, Officer, that you couldn't

6    bend his wrist to help control him?

7    A   I didn't have control of Mr. Efaw.

8    Q   I'm not asking you whether you did, or you didn't.

9    A   I cannot testify for other officers that were there.  I

10   was tired.  I didn't have any control over Mr. Efaw,

11   whatsoever.

12   Q   Do you see any reason, Officer, why it is that Officer

13   Elmore or Officer Langan couldn't grab his wrists and put

14   pressure in a hand hold?

15   A   Because he was out of control.

16   Q   Okay.  And that --

17   A   They were trying to hold onto Mr. Efaw, they couldn't even

18   do that.

19   Q   They couldn't hold onto him?

20   A   They were trying.

21   Q   But --

22   A   But he was out of control.  I mean, he was flailing

23   around, kicking, screaming, cursing, fuck you assholes, you

24   motherfuckers.  It was just an ongoing thing.

25   Q   There's no question that verbally he was abusive.  But

1    that's not really a reason why you can't use a handhold, is it?

2    A    It's a --

3            MR. KARAMESSINIS:  Well, Judge, that's not a proper

4    question.  He just indicated he was doing all kinds of things,

5    not just verbal --

6            THE COURT:  All right.  Well I'm going to sustain the

7    objection, on the basis that it's argumentative, at this point.

8            MR. LESSIN:  Okay, Your Honor.

9            THE COURT:  He's answered your questions.  Move on.

10   BY MR. LESSIN:

11   Q    How many different handholds were you taught for Falls

12   Township?

13   A    Taught for Falls Township?

14   Q    Yes.

15   A    Through defense tactics, which we do once a year, we get

16   taught several things.  But it was also in the beginning, when

17   I started the academy down in Virginia.

18            So it's been an accumulation of stuff that I have

19   learned, repetitiveness.

20   Q    So how many different handholds have you learned --

21   A    What I already testified to.

22   Q    Which is?

23   A    You could bend the wrist, you could grab the thumb, you've

24   got pressure points that you can use up on the ear and the

25   cheek.

1    Q   There's pressure points you can use on the ear and the

2    cheek?

3    A   That's correct.

4    Q   Okay.  And anything else, other than what you just told

5    me?

6    A   I'm sure there's other things, but I just use what I was

7    taught.

8    Q   Okay.

9    A   When applicable.

10   Q   Let's pick it up from -- your shift that night was when?

11   A   It was 11 p.m. to 7:30 a.m.

12   Q   And you were on assignment patrolling section 4, is that

13   right?

14   A   Yes, that would be correct.

15   Q   All right.  And you first observed Efaw's vehicle when his

16   vehicle was in the Sunoco parking lot, is that fair?

17   A   Yes, that's fair.

18   Q   And then, eventually, Officer Rhodunda, pulled into the

19   parking lot -- eventually you pulled into the parking lot

20   adjacent to the Sunoco, is that right?

21   A   Yes.

22   Q   Okay.  And when you pulled out -- when Efaw's vehicle

23   pulled out, you followed him, correct?

24   A   That's correct.

25   Q   All right.  And how far is the Sunoco from the house that

1  Efaw hit, by the way?

2  A   A short distance.  Let's say within a quarter of a mile.

3  Q   Okay.  At the Sunoco, Efaw didn't appear to be

4  intoxicated?

5  A   I could not tell if he was intoxicated or not.  Obviously,

6  because I was nowhere near him.

7  Q   Right.

8  A   I was just observing Mr. Efaw, because he was there for an

9  extended period of time.

10  Q   Sure.  But if you thought he was intoxicated, you would

11  never let him get into a car and drive?

12  A   That's correct.  Absolutely not.

13  Q   Right.  So -- all right.  So now, as soon as you activate

14  your lights, he takes off, is that right?

15  A   Yes, that's correct.

16  Q   All right.  And he accelerated to 70 miles an hour?

17  A   I accelerated to 70 miles an hour.

18  Q   Okay.  What was he doing?

19  A   At that point, I begin to slow down.  Because the road

20  that we were on is a residential road, the speed limit's 25.

21  And as I start to back off, he was accelerating, pulling away

22  from me rapidly, coming up to a T intersection.

23  Q   Okay.  And, also, you're not permitted to drive over a

24  certain rate of speed in a pursuit, unless it's a felony,

25  correct?

1    A    No, that's not correct.

2    Q    That's not correct.  You can drive at any speed you want,

3    even if it's --

4    A    Well it's got to be reasonable and safe.  I'm not going to

5    endanger myself, the general public.  You don't want to

6    jeopardize somebody.

7    Q    All right.  So now you get to the back of the house and --

8    or you get -- the accident occurs where Mr. Efaw drives his

9    vehicle through the garage, and then hits a trampoline.  And

10   then what happens?

11   A    Well as I observe him strike the house, there was a big

12   cloud of dust, I saw sparks.  I saw the taillights disappear.

13   At that point, I got on the radio and let fellow officers know

14   what I had.

15        I got out, I ran up to the house, because he had just

16   crashed into a house.  So I didn't know if there were people in

17   that portion of the house.  People renovate, change their

18   houses, so I didn't know if it was a garage, if it wasn't a

19   garage.

20        And as I'm running up, I didn't know that there --

21   obviously, the bushes that were alongside the driveway were no

22   longer there, that's when I tripped and fell and hurt my knee.

23        So, eventually, when I got back to the backyard, I

24   saw the maroon vehicle that I was following, the interior light

25   was on, the driver's side door was open.

1    It had hit a trampoline and was up against a utility

2    pole, it was crushed up against a utility pole.

3    Q   Okay.  So then what did you do?

4    A   Then, at that point, I was letting fellow officers know,

5    because they were asking me what I had.  I told them that the

6    subject that was driving the vehicle had fled on foot.  While I

7    was doing that, I heard fences rattling.

8        And then, as I looked to my left, I can see the

9    motion detector lights in the yards, a couple of yards going

10   down away from the house where the vehicle had just crashed

11   into, motion detector lights were going on, I could hear fences

12   rattle.

13       So then I went back out to the front of the house.

14   Q   Okay.  And when you got to the front of the house, what

15   did you do?

16   A   I saw the subject limping a few houses down, coming from

17   the rear yards to the front yards, and was running down the

18   driveway, or the front yard area down towards Lawrence Drive

19   (phonetic).

20   Q   Okay.  And then what did you do?

21   A   At that point, I was yelling down to him, police

22   department, stop.  Obviously, there was some people that came

23   out of the house, because they heard the loud banging noise.  I

24   chased him on foot.

25       We ran a couple of streets, and then he ran down the

1    block, and then eventually disappeared in between two houses

2    somewhere in the middle of the block.

3    Q    Okay.  And then what?

4    A    At that point, I got down there.  I'm starting to get

5    exhausted.  I run to the backyards.  As I'm looking around, I

6    don't see him, I don't hear anything.  It's extremely dark.  At

7    one point, I stop to listen to see if I could hear fences

8    rattling, to see if maybe I can hear him, if he's still

9    running, or if he's hunkered down hiding behind a bush, or

10   something along those lines.

11   Q    And then what?

12   A    Well, at that point, I turn my flashlight on, I start

13   looking across the backyard.  As I look across the backyard to

14   the right of the house that I'm in, there's a dog that was on

15   the opposite side of the yard, and was standing there and his

16   ears were up, his tail was up.

17        And the dog was looking at me.  Then the dog would

18   look to the left, towards the back of the house.  And then

19   would look back at me.  And then the dog would look back to the

20   back of the house, then look back at me.

21        So, obviously, I knew somebody was standing near the

22   house.  Now when I looked to the right, and I could look along

23   the back of the house, there was an object that I believe it

24   was like one of those tall plastic yard bins that you use, you

25   put like yard rakes, tools and stuff like that.

1          And then I walked around, and that's when I saw the

2     subject.  He was standing there with his back towards me, his

3     hands he had down by his abdomen area, and it was like standing

4     up against a corner of the house where that tall bin storage

5     facility thing was.

6     Q    And then you yelled at him to turn around and show your

7     hands?

8     A    That's correct.  Yeah, I had to say that more than once.

9     Q    Right.

10    A    Several occasions.

11    Q    But he finally responded?

12    A    Eventually, he listened and came out from the house.

13    Q    He put his hands straight up and he took a couple of steps

14    away from the residence, correct?

15    A    He put his hands up, but I would not say straight up.

16    But, yes, he did, he did take a few steps away from the house.

17    Q    Okay.  Page 43, line 16.  I asked you:

18              "What response did he give you?"

19              And the answer that you gave was, and you can --

20              MR. LESSIN:  Would you like to give him a copy of

21    his --

22              MR. KARAMESSINIS:  Yes.  Page, Jeff, you said?

23              MR. LESSIN:  Page 43.  Line 16.

24              OFFICER RHODUNDA:  Okay.

25    BY MR. LESSIN:

1    Q    Question was:

2              "What response did he give you?"

3              And your answer was:

4              "He put his hands straight up, he turned took a

5    couple of steps away from the residence, and stood there."

6    A    Okay.

7    Q    Is that what you said back then?

8    A    Absolutely.  You know that.  You were there.

9    Q    Okay.  So are you going to disagree with that testimony

10   now?

11   A    Sure.

12   Q    Sure, you are going to disagree?

13   A    It was four years ago.  I'm trying to go off the best of

14   my recollection, as best as I can.

15   Q    All right.  Then you told Mr. Efaw to get down on his

16   knees, correct?

17   A    Yes.

18   Q    And, initially, he ignored the command, but then he does

19   go down on one knee?

20   A    Eventually, he gets down on one knee, correct.

21   Q    Okay.  And you're still holding your flashlight, correct?

22   A    Correct.

23   Q    All right.  And there's no gun, there's no pepper spray,

24   there's no baton, am I right?

25   A    I do not carry a baton.  I did not have my gun out.  And

1    my pepper spray was in the holder.

2    Q    Okay.  So then you tried to take him into custody, after

3    he gets down on one knee, correct?

4    A    That is correct.

5    Q    And you grabbed his right arm, with your right arm, and

6    you were holding the flashlight in your left hand?

7    A    That is correct.

8    Q    And you got one handcuff on him, didn't you?

9    A    At some point, yes, I was able to get one on.

10   Q    And then you were joined by the other officers, correct?

11   A    Eventually, yes.

12   Q    Okay.  So -- and the officers, it took, what, a minute to

13   get him under control?

14   A    I'm not sure.  I couldn't give you exact time I was

15   fighting with the gentleman.

16   Q    All right.  But you had him under partial control when the

17   other officers show up -- actually, before the other officers

18   showed up, you had Mr. Efaw under partial control, didn't you?

19   A    I was -- I had him down on the ground.  I was doing pretty

20   good in keeping him down there.  I had him under partial

21   control.  But I was -- I was getting extremely tired,

22   obviously, after running.

23   Q    Officer --

24   A    And dealing with him.

25   Q    -- is it -- do you recall reading your deposition?

1   A    Sure.

2   Q    Do you remember telling me that -- on page 54 of your

3   deposition -- or excuse me -- page 51 of your deposition, that

4   you had Mr. Efaw under partial control?

5   A    Which page?

6   Q    51.

7   A    51.  Yeah, partial control.  That's what I just testified

8   to.

9   Q    All right.  I just want to make sure we're talking the

10  same thing.

11  A    Yes, sir.

12  Q    All right.  Now while -- before the other officers showed

13  up, there was other -- you were talking to other members of Mr.

14  Efaw's family, is that right?

15  A    After the confrontation started between me and him and I

16  got him down on the ground, I heard the sliding glass door

17  behind me open.

18          And when I turned to look, a man was coming out

19  towards us.

20  Q    All right.  And didn't you ask the man what address you

21  were at, so you could radio it to the other people?

22  A    Not the man.  It was the woman.

23  Q    Okay.  You asked her.

24  A    That's correct.

25  Q    And she told you.

1    A    She did.

2    Q    Okay.  And by the time the police officers arrived, you're

3    sitting on Efaw, isn't that right -- Mr. Efaw.

4    A    That's correct.

5    Q    Now you testify -- you said that you didn't see anybody

6    use a baton on Efaw in the backyard.

7    A    That is correct.

8    Q    All right.  You didn't see anyone even pull out a baton to

9    use it, correct?

10    A    I didn't see anybody pull out a baton.  Once two officers

11    got there, I immediately stepped back.  Because, at that point,

12    I was tired, I was exhausted.  I just ran, you know, so I

13    didn't have -- I didn't see -- I stepped back.  It was still

14    dark back there.  You know, there was no lights.

15    Q    Okay.  And you weren't able -- where were you looking,

16    after you stepped back, did you look -- did you start to look

17    somewhere else?

18    A    Well, at one point, I did take a look back, I remember

19    looking back, the woman was still standing there.  Because she

20    was telling her son to stop fighting the police.

21    Q    Okay.  I understand that.  But you were able to see what

22    was going on.  I mean, you weren't blind to what was happening

23    back there.

24    A    No, I'm not blind, no.  No, I'm not blind.

25    Q    Okay.  So you never saw a baton?

1    A    Nobody struck him.  No.

2    Q    Right.  And then you don't recall anybody using pepper

3    spray, is that right?

4    A    During the deposition, I testified no.  After reading my

5    reports -- after reading my reports, the use of force report

6    that I filled out on the night of the incident, I had indicated

7    on my report that I had used pepper spray.

8         So, obviously, it was a mistake on my part on the day

9    that I was deposed by you.

10   Q    Would you agree with me that the reports you did

11   immediately after the accident -- or after this incident, were

12   much more accurate than the deposition testimony that you

13   gave?

14   A    Oh, absolutely.  Yes.  It was just, I made a mistake at

15   the deposition.  I just --

16   Q    Now the pepper spray, now that you've read your report, do

17   you remember whether or not the pepper spray that you used was

18   effective on Mr. Efaw?

19   A    No.

20   Q    No, you don't remember?

21   A    No, it just make him even more angrier than he already

22   was.  He didn't like the fact that we were there.

23   Q    Okay.  So it wasn't effective, is that what you're telling

24   me?

25   A    It wasn't effective, yes.

1    Q    Okay.

2            MR. LESSIN:  Can we put up -- oh, how can I put the

3    use of force report on the --

4            UNIDENTIFIED SPEAKER:  I got it.

5            MR. LESSIN:  Okay.

6            THE COURT:  Are you okay?

7            OFFICER RHODUNDA:  I'm fine, Your Honor.  Thank you.

8            THE COURT:  Can you see whatever it is?

9            OFFICER RHODUNDA:  Yeah, I --

10           MR. LESSIN:  Just for the record, Your Honor, the use

11   of force report is P-17.

12           THE COURT:  Okay.

13           MR. LESSIN:  Thank you.  Can you all see that?  P-17?

14   Okay.

15   BY MR. LESSIN:

16   Q    This is a use of force report, which you are required to

17   fill out by Falls Township after an incident, after you use

18   force, right?  After you use above a level 2, right?

19   A    Yes.  That's correct.

20   Q    Okay.  Now is this your handwriting on this report?

21   A    No, it is not.

22   Q    Whose handwriting is that?

23   A    I'm not 100 percent positive, but it could be Officer Ward

24   -- Corporal Ward's.

25   Q    Okay.  Do you see where it says J. Rhodunda, Badge 94?

1   A    Yes.

2   Q    And it says -- it says OC chemical checked off, do you see

3   that?

4   A    Yes.

5   Q    And it says effective.

6   A    It says not effective.

7   Q    It says not effective?

8   A    It says not effective.

9   Q    Let me --

10  A    Where it says effective, it's for use of the canine.

11  Q    You're looking at the wrong use of force report -- or I

12  put the wrong one up.  There's --

13           THE COURT:  Do you have one in yours?

14           MR. LESSIN:  That's the wrong one, Mark.

15           THE COURT:  Is that marked D -- is there a D mark for

16  that, counsel?

17           MR. LESSIN:  Thank you.

18           THE COURT:  Mr. Karamessinis, is there a D exhibit

19  that's the one he's searching for?

20           MR. KARAMESSINIS:  This is our D -- what is it?  D-

21  13.

22           THE COURT:  D-13.  Thank you.

23  BY MR. LESSIN:

24  Q    Okay.  Officer Rhodunda --

25  A    Yes.

1      MR. LESSIN:  What number are we on now?  I'm sorry?

2  BY MR. LESSIN:

3  Q   We put the wrong use of force report up.  But let me talk

4  about that, since it happened.  My understanding is, from

5  Officer Langan's testimony, that you're only supposed to fill

6  out one use of force report, is that true or not true?  And the

7  arresting officer's required to do it.

8      MR. KARAMESSINIS:  Judge, I'm just going to object

9  that's --

10     THE COURT:  I can't even understand --

11     MR. LESSIN:  I'll -- Your Honor, I'll withdraw it and

12  I'll start again.

13     THE COURT:  All right.

14  BY MR. LESSIN:

15  Q   Officer Langan testified that the arresting officer is

16  required to fill out the use of force report, is that true or

17  not true?  Not that he -- is it true that only one use of force

18  report's supposed to be filled out?

19  A   Any officer that goes above level 2 on the force continuum

20  is required to fill out a use of force form.

21  Q   Okay.  So that a use of -- and level 2 is physical force,

22  correct?

23  A   That's correct.

24  Q   Okay.  Have you seen a physical use of force report filed

25  out by Officer Langan?

1    A    No, I have not.

2    Q    Okay.  I'm going to represent to you that I've never seen

3    a physical use of force -- a use of force report filled out by

4    Officer Langan.  Now that being the case, isn't it --

5    A    There's more than one spot for more than one officer on

6    one use of force report.

7    Q    Right.  Okay.

8    A    So as long as it's completed and the officers that were

9    involved in a use of force that rises above a level 2, and

10   they're on that form, and it's in with the report, it's

11   completed.

12   Q    Well is Officer Langan's -- Langan on this use of force

13   report that I'm showing you here?

14   A    This one, no.

15   Q    Okay.  Well he wasn't on the other one, either.  Are you

16   aware of that?

17   A    Well, yeah, I saw the other one, I didn't see his name on

18   there.

19   Q    Okay.  So my question still stands, should Officer Langan,

20   assuming that he used level 2 force or above, have filled out a

21   use of force report?

22   A    No, it probably should have been my job to put him on the

23   use of force form.

24   Q    Okay.  So you made the mistake?

25   A    That would be correct, yeah.

1  Q   Okay.  And what about Officer Ward, did you -- why didn't
2  you put down Officer Ward on your use of force report?
3  A   Because Officer Ward had a canine dog, he's separate from
4  us.  If he uses -- that's Officer Ward -- that's what he does.
5  I have nothing to do with that.
6  Q   So, in other words, if he filled out a form, he shouldn't
7  have put your name on there, or Officer Langan, because he's
8  separate.  Is that what you're telling me?
9  A   He has to fill out his own, for his actions.  Now if he
10 chooses to put other officers on there, I mean, he's more than
11 willing to, because there's more than one spot on there.
12 Q   All right.
13 A   It could have been just confusion amongst us as to who did
14 the report.  It could be just something on that.
15 Q   Was this done the night of the incident?
16 A   Yes, the night of the incident.
17 Q   Were you aware, Officer, that Mrs. Bonner, Kevin Efaw's
18 mother, had called the police department on October 4th about
19 complaining about the use of the dog?
20 A   No, I did not know that.  No.
21 Q   You see, at the top of this form, where it says, received
22 October 9th, 2005?
23 A   No, I can't.  Can you move it down?
24 Q   Sure.  "Rec 10/9/05."  Do you see that?
25 A   Yes.

1    Q    Okay.  Do you know what that means?

2    A    No.

3    Q    That's after October 4th, isn't it?

4    A    Okay.  Yes.

5    Q    Okay.

6    A    Obviously.

7    Q    Now at the bottom of this form, you put a description on

8    your use of force report, do you see that?

9    A    Yes.

10   Q    It says -- and is this your handwriting, by the way?

11   A    Yes, it is.

12   Q    And, incidentally, before I get to that part, on offense

13   it says, "accident, flee and elude," do you see that?  At the

14   top of your use of force form?

15   A    Yes.

16   Q    Okay  And then it says, "time, 1:14."  What does that

17   stand -- 01:14 what does that stand for?

18   A    That would be the start time that I got on police radio.

19   So that would be the time that was logged through the

20   dispatcher.

21   Q    And what time, if you can recall, how long do you think it

22   was before you actually brought Mr. Efaw out front, where

23   Officer Langan and Elmore brought Mr. Efaw out front, how long

24   was that?

25   A    I couldn't tell you.

1    Q    Ten minutes?

2    A    I have no idea.

3    Q    Three minutes?  You have no idea, whatsoever.

4    A    It would be on my report from the dispatcher, but I

5    couldn't give you an estimate.  Fifteen minutes, 20 minutes, I

6    don't know.

7    Q    Fifteen to 20 minutes.  Is that fair?

8    A    I don't know.  I don't know if it is or not.  I don't know

9    how long it took.

10   Q    All right.  But certainly it wasn't 5 minutes by the time

11   you called the dispatcher and you --

12   A    No, it definitely was not 5 minutes.

13   Q    It was more than five minutes?

14   A    Absolutely.

15   Q    Okay.  All right.  Now, again, looking at this use of

16   force form that you filled out.  You have a description -- I'm

17   so bad at this -- and the description said:

18        "On above said date and time the suspect, Efaw,

19   attempted to flee and elude police.  Efaw crashed his vehicle

20   into an occupied structure, which was followed by foot pursuit.

21   As the subject was being taken into custody, this officer was

22   met with strong resistence.  OC spray was used to take subject

23   Efaw into custody."

24        Did I read that correctly?

25   A    Yes, you did.

1    Q    Okay.  And at the bottom it says approved, right?

2    A    I can't see it.

3    Q    I'm sorry, at the bottom is your signature?

4    A    Yes.

5    Q    Okay.  It's cutoff.  This is the way I got it, but it's

6    cutoff.

7    A    Yeah, my signature, my badge number and the date I turned

8    the report in.

9    Q    Right.  There is not one mention in this report of my

10   client assaulting Officer Elmore.

11   A    This is not my police report, this is just a use of force.

12   In my police report, it goes in to say that.

13   Q    I'm going to get to your police report, what your police

14   report says.

15   A    Okay.

16   Q    In fact, let's look at that now, since you mentioned it.

17         THE COURT:  May I see both counsel at sidebar,

18   please?

19              (Sidebar Conference Under Seal)

20         MR. LESSIN:  What number are we up to?  I'm calling

21   this Rhodunda's incident report.

22         UNIDENTIFIED SPEAKER:  P-18.

23         MR. LESSIN:  P-18.  All right.  Let's go to the last

24   page of P-18.  No, let's go to the third page.  All right.  Can

25   you all see that?

1        OFFICER RHODUNDA:  No.

2        MR. LESSIN:  Let's -- this is important --

3    BY MR. LESSIN:

4    Q    Incidentally, Officer, when you filled out this report,

5    did you tell the truth?

6    A    Yes.

7    Q    Were you trying to be accurate and complete?

8    A    Yes.

9    Q    Okay.  This is the third page of your incident report,

10   right?

11       THE COURT:  Can you see that?

12       OFFICER RHODUNDA:  Yes, I can see it.  If that's page

13   three, that's fine.  I can't see the whole page.

14   BY MR. LESSIN:

15   Q    Okay.  Well at the bottom -- I'm going to move it -- at

16   the bottom, you see, is that your signature at the bottom

17   there?

18   A    Yes.

19   Q    Okay.  And your badge number?

20   A    Yes.

21   Q    And it says 3 of 3?

22   A    Yes.

23   Q    And that means 3 -- page 3 of 3.

24   A    Self-explanatory, yes.

25   Q    Yes.  It's self-explanatory.  Okay.  Now I'm going to read

1  this.

2         "The subject, who was identified, Efaw, resisting my

3  attempts to place him into custody by kicking and throwing his

4  arms toward me.  I was able to partially get Efaw cuffed,

5  before Officer Langan and Officer Elmore arrived."

6         Now do you see this, so far?

7  A   Yes.

8  Q   All right.

9         "At the time Efaw was placed into custody, not

10  without a fight, we then escorted Efaw to Officer Elmore's

11  patrol vehicle."

12         Now here's the key part.

13         "When we got to Officer Elmore's vehicle, Efaw pushed

14  back, knocking Officer Elmore aside."

15         Do you see that?

16  A   Yes.

17  Q   You show me in that report that you wrote the truth on,

18  where you have Officer Elmore in a bear hug, getting banged

19  against the van?  Against a vehicle, Officer.

20  A   I didn't testify to that.

21         THE COURT:  Is that a question?

22         OFFICER RHODUNDA:  Is that a question or a statement?

23  BY MR. LESSIN:

24  Q   Show me on here where it says he was knocked against --

25         MR. KARAMESSINIS:  Judge, he's being argumentative.

1    THE COURT:  All right.  Once more.  Clear and not

2    argumentative.

3    BY MR. LESSIN:

4    Q   Is this true, Officer?

5    A   Yes.

6    Q   So it's true that, when we got to Officer Elmore's

7    vehicle, Efaw pushed back, knocking Officer Elmore aside,

8    that's what he did?

9    A   Yes.  It's in my report.

10   Q   I'm sorry?

11       THE COURT:  He responded yes.

12       MR. LESSIN:  I didn't hear the -- I heard the yes, I

13   didn't hear --

14       OFFICER RHODUNDA:  I responded yes.  That's what I

15   wrote in my report.

16   BY MR. LESSIN:

17   Q   Okay.  And there's no mention in here at all of a struggle

18   between Officer Elmore and Mr. Efaw, isn't that correct?

19   A    No.  It's basically a summation.  As I testified earlier,

20   I was not directly behind Officer Langan and Elmore, when they

21   were escorting Mr. Efaw down the driveway.  I was a good

22   distance -- I was behind them.  I wasn't directly up on them.

23   At one point, I saw Officer Elmore get knocked --

24   Q   Aside.

25   A   -- aside and into a vehicle.  Which I believe I testified

1    in deposition to.

2    Q   Okay.  So you're saying that you didn't -- so did --

3    you're saying you never saw -- and I want to make sure we're

4    clear here.  Did you ever see Officer Elmore being in a reverse

5    bear hug with my client?

6    A   I saw Mr. Efaw hit, as he was struggling, he was --

7    obviously, he's taller and bigger, and he was getting a

8    defensive stance.  And, at one point, he was able to get a good

9    position, lean down and shove and hit Officer Elmore, which

10   knocked him aside and into a vehicle.

11   Q   Okay.  So the -- and, by the way, you don't say there that

12   he was knocked even into a vehicle.  You just said he was

13   knocked aside.

14   A   That's correct.  It's just a summation of what occurred.

15   Q   Right.  And you didn't see any damage to any vehicles

16   there as a result -- other than Mr. Efaw's -- as a result of an

17   impact of Officer Elmore allegedly hitting some vehicle, right?

18   A   I didn't see no damage, no.

19           THE COURT:  Counsel?

20           MR. LESSIN:  Okay.  We'll stop here.

21           THE COURT:  Thank you.  Jurors, I try to close, and

22   I'll know better tomorrow what your schedules are, because

23   you'll be questioned on it.  But it's 4:30 now.  So we will

24   basically recess until tomorrow at 9:30.

25           You will report again through the buzzer system, to

1    the conference room where you are when you're on various

2    recesses.

3            And, therefore, I will see you tomorrow morning at

4    9:30.  There is one other thing I should mention to you.  I

5    hear the word deposition.  And you should understand that it is

6    common practice to depose, to basically question witnesses who

7    will subsequently testify at trial, to question them under oath

8    prior to the actual trial.

9            So that this gives the counsel a opportunity to know

10   exactly what, or within the range of the questioning, what the

11   individual will testify to at time of trial.

12           So when you hear deposition, this is a prior sworn

13   recording of the individual at an earlier time.  Thank you.

14                       (Jury Exits)

15           THE COURT:  Okay.  Counsel, there are two jurors from

16   Lehigh County.  They have the opportunity to stay overnight, at

17   the cost of the Court, or to go home.

18           That's fine, that's not a big issue.  The other,

19   there is a problem, in that two of the jurors have commitments

20   to start vacations, one on Saturday, the other one on Sunday.

21   So we must finish Friday, so that they can deliberate, even if

22   it stays up until whenever.

23           But we must complete it.  The way it's going, it

24   would appear that that would be on focus.  But I want to alert

25   you to their schedules.

1    MR. LESSIN:  Your Honor, may I just ask that you

2    instruct the witness not -- he's on direct now, so he shouldn't

3    be talking to any other witnesses about his testimony and all

4    that.

5    THE COURT:  Yes.  That's fair.  Once you're on --

6    you're officers, you know.  Once you're under oath and there is

7    a time period in between, the only person you can talk to is

8    your counsel.  Okay?

9    Thank you very much.  I'll see you all around 9:15

10   tomorrow morning.  This courtroom is locked, so you don't have

11   to worry about anything.  This building is actually more secure

12   than the other.

13   It's also prettier.

14   (Court adjourned)

15                         * * * * *

16                  C E R T I F I C A T I O N

17   I, Josette Jones, court approved transcriber, certify that the

18   foregoing is a correct transcript from the official electronic

19   sound recording of the proceedings in the above-entitled

20   matter.

21

22   --------------------------------        -------------------

23   JOSETTE JONES                                    DATE

24   DIANA DOMAN TRANSCRIBING